**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| JOHN DOE A.S.M., and | : |
| JANE DOE M.L.R.M., and | : CIVIL ACTION NO. |
| JANE DOE E.R.R., and | : |
| JANE DOE E.G.P., and | : JURY TRIAL DEMANDED |
| JOHN DOE A.A.C., | : |
| | : |
| Plaintiffs, | : |
| | : |
| | : |
| v. | : |
| | : |
| THE CHEESECAKE FACTORY, INC. | : |
| and THE CHEESECAKE FACTORY | : |
| BAKERY, INC., and THE | : |
| CHEESECAKE FACTORY | : |
| RESTAURANTS, INC., JOHN DOES | : |
| 1-100, and ABC ENTITIES 1-10, | : |
| | : |
| Defendants. | : |

---

## COMPLAINT – CIVIL ACTION

### *The Parties*

1.     Plaintiff John Doe A.S.M. is an adult male whose name and address is not contained in this Complaint so as to protect his privacy and identity as he incurred injuries and damages of a sensitive nature as a result of the intentional and negligent acts and failures of Defendants outlined below.  Information which would or could identify John Doe A.S.M. is not contained herein. Plaintiff may be contacted through his counsel as outlined herein.  John Doe A.S.M. is a citizen of Mexico and a resident of the Commonwealth of Pennsylvania.

2.     Plaintiff Jane Doe M.L.R.M. is an adult female whose name and address is not contained in this Complaint so as to protect her privacy and identity as she incurred injuries and damages of a sensitive nature as a result of the intentional and negligent acts and failures of

Defendants outlined below.  Information which would or could identify Jane Doe M.L.R.M. is not contained herein.  Plaintiff may be contacted through her counsel as outlined herein.  Jane Doe M.L.R.M. is a citizen of Mexico and a resident of the Commonwealth of Pennsylvania.

3.     Plaintiff Jane Doe E.R.R. is an adult female whose name and address is not contained in this Complaint so as to protect her privacy and identity as she incurred injuries and damages of a sensitive nature as a result of the intentional and negligent acts and failures of Defendants outlined below.  Information which would or could identify Jane Doe E.R.R. is not contained herein.  Plaintiff may be contacted through her counsel as outlined herein.  Jane Doe E.R.R. is a citizen of Mexico and a resident of the Commonwealth of Pennsylvania.

4.     Plaintiff Jane Doe E.G.P. is an adult female whose name and address is not contained in this Complaint so as to protect her privacy and identity as she incurred injuries and damages of a sensitive nature as a result of the intentional and negligent acts and failures of Defendants outlined below.  Information which would or could identify Jane Doe E.G.P. is not contained herein.  Plaintiff may be contacted through her counsel as outlined herein.  Jane Doe E.G.P. is a citizen of Mexico and a resident of the Commonwealth of Pennsylvania.

5.     Plaintiff John Doe A.A.C. is an adult male whose name and address is not contained in this Complaint so as to protect his privacy and identity as he incurred injuries and damages of a sensitive nature as a result of the intentional and negligent acts and failures of Defendants outlined below.  Information which would or could identify John Doe A.A.C. is not contained herein. Plaintiff may be contacted through his counsel as outlined herein.  John Doe A.A.C. is a citizen of Mexico and a resident of the Commonwealth of Pennsylvania.

6.     Plaintiffs' claims are properly joined pursuant to Fed. R. Civ. Pro. 20 as they arise out of the same transaction, occurrence, or series of transactions or occurrences and involve

common questions of law and/or fact, namely, the history and culture of hostility, discrimination, forced labor, and labor trafficking at The Cheesecake Factory restaurant in Willow Grove, Pennsylvania that resulted in the injuries and damages suffered by Plaintiffs.

7.    Defendant, The Cheesecake Factory, Incorporated, is, and all relevant times mentioned herein was, a corporation organized under the laws of the State of Delaware.  The Cheesecake Factory, Incorporated's primary place of business is located at 26901 Malibu Hills Road, Calabasas, California 91301-5354. The Cheesecake Factory, Incorporated, owns and operates the Cheesecake Factory restaurant location with an address of 2500 W Moreland Rd #3225, Willow Grove, PA 19090. (sometimes referred to as "TCF Willow Grove")

8.    Defendant, The Cheesecake Factory Bakery, Incorporated is, and at all relevant times mentioned herein was, a corporation organized under the laws of the State of Delaware. Cheesecake Factory Bakery Inc.'s primary place of business is located at 26901 Malibu Hills Road, Calabasas, California 91301-5354. he Cheesecake Factory Bakery, Incorporated, owns and operates the Cheesecake Factory restaurant location with an address of 2500 W Moreland Rd #3225, Willow Grove, PA 19090.

9.    Defendant, The Cheesecake Factory Restaurants, Incorporated is, and all relevant times mentioned herein was, a corporation organized under the laws of the State of Delaware. Cheesecake Factory Restaurants' primary place of business is located at 26901 Malibu Hills Road, Calabasas, California 91301-5354.  The Cheesecake Factory Restaurants, Incorporated, owns and operates the Cheesecake Factory restaurant location with an address of 2500 W Moreland Rd #3225, Willow Grove, PA 19090.

10.     The Cheesecake Factory, Incorporated owns, operates, controls, manages, and/or does business as The Cheesecake Factory Bakery, Incorporated and/or The Cheesecake Factory Restaurants, Incorporated.

11.     The Cheesecake Factory Bakery, Incorporated owns, operates, controls, manages, and/or does business as The Cheesecake Factory, Incorporated and/or The Cheesecake Factory Restaurants, Incorporated.

12.     The Cheesecake Factory Restaurants, Incorporated owns, operates, controls, manages, and/or does business as The Cheesecake Factory, Incorporated and/or The Cheesecake Factory Bakery, Incorporated.

13.     Throughout this Complaint, Defendants The Cheesecake Factory, Incorporated, The Cheesecake Factory Bakery, Incorporated, and The Cheesecake Factory Restaurants, Incorporated may be referred to collectively as "TCF."

14.     John Does 1-100 are current and or former employees, staff, managers, or other individuals who were employed at or otherwise had supervision over the operations of TCF Willow Grove and/or TCF.

15.     ABC entities 1-10 are current and or former private and/or incorporated entities who had responsibilities to ensure the safety and protection of TCF staff and employees, and, more specifically, to prevent the abuses and violations of law described more fully herein from occurring.

### *Facts Common to All Causes of Action*

16.     Today, The Cheesecake Factory is a multi-billion-dollar global company specializing in casual dining. The Cheesecake Factory owns and operates more than 200 restaurants throughout the world under The Cheesecake Factory® mark.

17.     The Cheesecake Factory holds itself out to the public and its employees as a center for excellence, dedicated to "creating an energized, rewarding, safe, and healthy work environment" where management is "committed to doing what is right without exception." In reality, The Cheesecake Factory has, for years, fostered a culture of racism and abuse and facilitated the hiring of undocumented workers, including Plaintiffs, through the manufacture of false and fraudulent working papers just so that The Cheesecake Factory could abuse those undocumented workers all for its own financial benefit. The multi-billion-dollar company that it is today has been built on an enterprise of employment discrimination, forced labor, and trafficking in persons.

18.     In particular, each of the Plaintiffs named herein worked at The Cheesecake Factory in Willow Grove, Pennsylvania, where they were enticed by The Cheesecake Factory to obtain false and fraudulent government documents in order to work in what Plaintiffs were led to believe was a safe and healthy work environment. The Cheesecake Factory in Willow Grove became a cottage industry of fraud and coercion, systematically recruiting undocumented persons, directing those undocumented persons to specific shadowy figures to obtain fake work papers—often right on the premises of the Cheesecake Factory in Willow Grove—and then abusing and mistreating those undocumented persons whenever it was convenient for managers and American staff.

19.     To be clear, the trafficking venture built at The Cheesecake Factory, and in particular the conspiracy to manufacture fraudulent work documents, was not for the benefit of the undocumented persons hired at The Cheesecake Factory. Far from it. The Cheesecake Factory, in particular at its Willow Grove location, recruited undocumented workers and enticed them with the promise of steady work with fake papers purely so that The Cheesecake Factory could continue padding its profits. This venture was designed to financially benefit The Cheesecake Factory so

that The Cheesecake Factory could obtain what amounted to free labor from undocumented persons to fatten up the bottom line of the business. This venture was further supported by rampant discriminatory behavior and constant threats of deportation for any that would think of stepping out of line.

20.    As will be outlined further below, the Plaintiffs in this case, along with many other undocumented individuals, were subjected to the following after management at The Cheesecake Factory set them up with fraudulent working papers:

a.  Being forced to work hours they were not paid for;

b.  Being forced to work overtime hours while not being paid overtime;

c.  Being constantly threatened with deportation if they did not work hard enough or fast enough (according to management's standards);

d.  A work environment where they were not allowed to take bathroom breaks during shifts;

e.  A work environment where they were not allowed to take breaks for meals during shifts;

f.  Constant and pervasive racial discrimination including being called racial slurs;

g.  Being forced to work during the Covid-19 pandemic lock down under conditions that wholly ignored prevailing safety practices while American co-workers were at home;

h.  Being forced to sign documents in English while management knew full well they did not read, write, or speak English;

i.  Being forced to work while sick;

j.  Being forced to work while injured;

k. Being forced to work under extreme conditions including extreme heat and extreme cold;

l. Being forced to work under such intense conditions so as to develop lifelong medical conditions like arthritis.

21. At all times material hereto, Defendants acted by and through their authorized agents and/or employees acting within the course and scope of their employment with Defendants and in furtherance of Defendants' business.

22. At all times material hereto, Defendants knowingly provided or obtained the labor or services of Plaintiffs by one or more of the following means: (1) force, threats of force, physical restraint, or threats of physical restraint to Plaintiffs or another; (2) serious harm or threats of serious harm to Plaintiffs or another; (3) abuse or threatened abuse of law or legal process; or (4) by a scheme, plan, or pattern intended to cause the Plaintiffs to believe that, if the Plaintiffs did not perform such labor or services, that the Plaintiffs or another would suffer serious harm or physical restraint.

23. At all times material hereto, Defendants knowingly benefitted, financially or by receiving anything of value, from participation in a venture which engaged in the providing or obtaining of labor or services by any one or more of the means described in the preceding paragraph, knowing or in reckless disregard of the fact that the venture engaged in the providing or obtaining of labor or services by those means.

24. Defendants conduct in this regard violated 18 U.S.C. § 1589.

25. At all times material hereto, Defendants knowingly recruited, harbored, transported, provided, and/or obtained by any means, Plaintiffs for labor or services.

26. Defendants conduct in this regard violated 18 U.S.C. § 1590.

27. Defendants also engaged in severe forms of trafficking as defined by the Trafficking Victim Protection Reauthorization Act ("TVPRA"). The TVPRA defines severe forms of trafficking involving forced labor, under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."

28. Defendants conduct in this regard violated 18 U.S.C. §§ 1589 and 1590.

29. Defendants TCF are liable to Plaintiffs because of their failures to act, their failure to act constituted a breach of their fiduciary duties as officers and/or directors; and/or their breach of those duties involved intentional misconduct, fraud or a knowing violation of law.

30. Defendants TCF caused the injuries and harms to Plaintiffs by failing to train, supervise, and/or discipline the staff, employees, and/or management at TCF Willow Grove, including, but not limited to, the John Doe Defendants and, as a result, staff at TCF Willow Grove, including the John Doe Defendants, as a matter of practice and custom, engaged in prohibited conduct on a systematic basis with the expectation that their conduct would not be subject to discipline or sanctions.

31. Because of Defendants' conduct, Plaintiffs suffered and will continue to suffer from physical, bodily injuries, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life. Plaintiffs have and will in the future sustain loss of earnings and earning capacity and have, and will, incur expenses for medical and psychological treatment, therapy and counseling. Defendants are liable for same as described more fully below.

32.    Defendants herein are directly and vicariously liable to Plaintiffs for injuries sustained as a result of negligence, gross negligence, outrageous conduct, and reckless misconduct, as described further herein, of persons or entities whose conduct was under their control, or right to control which conduct directly and proximately caused all Plaintiffs' injuries.

33.    At all times material hereto, Defendants constituted Plaintiff's employers under the joint and/or single employer doctrine. Upon information and belief, Defendants shared common management, had interrelated operations, and collectively controlled Plaintiff's job duties and responsibilities.

34.    At all times material hereto, Defendants employed more than twenty (20) individuals.

35.    At all times material hereto, Defendants were an employer within the meanings of the Title VII, and PHRA.

36.    At all times material hereto, Plaintiff was an employee within the meanings of the Title VII, and PHRA.

### *Jurisdiction and Venue*

37.    The jurisdiction of this Court is invoked pursuant to: 28 U.S.C. § 1331, this action involving questions of federal law; 18 U.S.C. § 1595, this action involving an offense under the federal Trafficking Victims Protection Act, 18 U.S.C. §§ 1589, *et seq*. and the offender is a national of the United States or present in the United States, irrespective of nationality.

38.    This Court is "an appropriate district court of the United States" in accordance with 18 U.S.C. §1595.

39.    This Court has supplemental jurisdiction over Plaintiffs' state law claims.

40.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this District.

### ***Proceedings Before the Equal Employment Opportunity Commission***

41.     On or about November 3, 2022, Plaintiff John Doe A.S.M. filed a Complaint with the Equal Employment Opportunity Commission ("EEOC"), complaining of the acts of discrimination alleged herein.

42.     On or about March 24, 2025, the EEOC issued to Plaintiff John Doe A.S.M. a Notice of Right to Sue. Attached hereto and marked as Exhibit "A" is a true and correct copy of this notice (with minor redactions for purposes of electronic filing of confidential/identifying information).

43.     On or about October 27, 2022, Plaintiff Jane Doe M.L.R.M.[1] filed a Complaint with the EEOC, complaining of the acts of discrimination alleged herein.

44.     On or about March 24, 2025, the EEOC issued to Plaintiff Jane Doe M.L.R.M. a Notice of Right to Sue. Attached hereto and marked as Exhibit "B" is a true and correct copy of this notice (with minor redactions for purposes of electronic filing of confidential/identifying information).

45.     On or about October 31, 2022, Plaintiff Jane Doe E.R.R. filed a Complaint with the EEOC, complaining of the acts of discrimination alleged herein.

46.     On or about March 25, 2025, the EEOC issued to Plaintiff Jane Doe E.R.R. a Notice of Right to Sue. Attached hereto and marked as Exhibit "C" is a true and correct copy of this notice (with minor redactions for purposes of electronic filing of confidential/identifying information).

---

[1] When she was hired by TCF, using fraudulent government documents as will be outlined in greater detail below, the fraudulent documents provided to Plaintiff M.L.R.M. used a name that was not her own. When submitting her Charge of Discrimination to the EEOC, Plaintiff M.L.R.M. used the name provided on the fraudulent government documents provided to her in connection with her employment at TCF Willow Grove.

47.     On or about October 27, 2022, Plaintiff Jane Doe E.G.P. filed a Complaint with the EEOC, complaining of the acts of discrimination alleged herein.

48.     On or about March 21, 2025, the EEOC issued to Plaintiff Jane Doe E.G.P. a Notice of Right to Sue. Attached hereto and marked as Exhibit "D" is a true and correct copy of this notice (with minor redactions for purposes of electronic filing of confidential/identifying information).

49.     On or about October 27, 2022, Plaintiff John Doe A.A.C. filed a Complaint with the EEOC, complaining of the acts of discrimination alleged herein.

50.     On or about March 29, 2025, the EEOC issued to Plaintiff John Doe A.A.C. a Notice of Right to Sue. Attached hereto and marked as Exhibit "E" is a true and correct copy of this notice (with minor redactions for purposes of electronic filing of confidential/identifying information).

### *Plaintiff John Doe A.S.M.*

51.     Plaintiff John Doe A.S.M. ("Plaintiff A.S.M.") was born on November 26, 1980, in San Baltazar, Tecamachalco, Puebla, Mexico. This is a small, poor community located in central Mexico. It is in the "red triangle," a region with extremely high levels of crime including fuel theft, trafficking, and car theft.

52.     When Plaintiff A.S.M. lived in Mexico, his family could not afford basic necessities and, for survival, he began to work when he was eleven years old, earning less than 200 pesos per week. At age 16, Plaintiff A.S.M. left school and was earning 290 pesos per week.

53.     Plaintiff A.S.M. eventually married and began a family. He continued working and was earning 600 pesos per week, barely enough money to feed him and his family. He had three daughters one of whom suffered from a chronic medical condition that cost 400 pesos a week to treat. After accounting for these medical expenses and other household expenditures relating to his

daughters, Plaintiff A.S.M. often had less than 200 pesos per week to pay for food for his entire family.

54.    In 2007 Plaintiff A.S.M. crossed the border from Mexico into the United States. He was not authorized by the government to enter the United States. He has not returned to Mexico since entering the United States in 2007. While still financially supporting his family in Mexico, Plaintiff A.S.M. has not seen any members of his family since 2007.

55.    After crossing into the United States, Plaintiff A.S.M. eventually settled in Norristown, PA. Plaintiff A.S.M. would send anything he could earn to his family in Mexico and often struggled to pay for basic necessities like food, clothing, and housing.

56.    At the end of 2012, Plaintiff A.S.M. heard about an opportunity for undocumented people to work at The Cheesecake Factory in Willow Grove and that The Cheesecake Factory management would give a person papers if they were undocumented.

57.    Plaintiff A.S.M. began working at The Cheesecake Factory at 2500 W Moreland Rd #3225, Willow Grove, PA 19090 in January 2013. He worked as a cook there until March 2022, when he was fired with most of the Latino staff.

58.    When Plaintiff A.S.M. applied, the manager, Jason Kennedy, knowing Plaintiff A.S.M. was in need of money and work, said that he would get Plaintiff A.S.M. papers so that Plaintiff A.S.M. could work there. TCF would not let Plaintiff A.S.M. work there without getting these fraudulent papers first as they were required for the job. Kennedy told Plaintiff A.S.M. to meet someone in the parking lot of TCF Willow Grove to get the papers. Plaintiff A.S.M. needed the money for his family, so he did what Kennedy said. At the time Plaintiff A.S.M. felt like he had no other choice.

59.     A man met Plaintiff A.S.M. in the parking lot of TCF Willow Grove and asked Plaintiff A.S.M. for his information.  Plaintiff A.S.M. paid the man $100.  The next day, The Cheesecake Factory called Plaintiff A.S.M. and said they had his papers, and he could come to work the next day. TCF gave him what appeared to be a Permanent Resident Card and a Social Security Card with his information on it. These documents, provided to Plaintiff A.S.M. by TCF, were fraudulent.

60.     While Plaintiff A.S.M. worked there, he was a cook that worked at various stations including the grill and fry station, the broiler, appetizers, and pasta. His job included chopping vegetables and cooking them, so he worked with a lot of knives and heat. The pasta station was by far the hardest, and where he worked the longest.

61.     Plaintiff A.S.M. typically worked eight to nine hours per day, five days per week. A TCF manager, Matt, promised Plaintiff A.S.M. he would make $12.75 per hour when he began working there, but his paychecks were only $12.00 per hour. On particularly busy days Plaintiff A.S.M. would work shifts that were over 12 hours in duration. On certain occasions Plaintiff A.S.M. was required to work shifts that were 16 – 17 hours in duration.

62.     Plaintiff A.S.M. was not paid for many of the hours he spent working at The Cheesecake Factory. The managers required him to come in several hours before his shifts, sometimes at 6 AM, and work for several hours before he was allowed to clock in. This happened multiple times per week, every week, for nearly a decade. TCF managers consistently found ways to get Plaintiff A.S.M. and other undocumented workers to work without pay. For example, if Plaintiff A.S.M. was even a couple minutes late for his shift, managers would clock him in as half an hour late and would not pay me for the time he worked. When Plaintiff A.S.M. worked overtime, TCF would never pay overtime wages for those hours.

13

63.     Management at TCF Willow Grove controlled every employee's working hours. Management controlled working hours not just by way of scheduling employees for particular shifts, but management was also responsible to clock in and clock out employees. In order to clock in or clock out a manager was required to swipe a card. Managers would routinely clock Plaintiff A.S.M. in later than he arrived for work and would clock Plaintiff A.S.M. out earlier than he would leave and while he was still working.

64.     Plaintiff A.S.M. was scared to complain about the money he wasn't getting paid because he was afraid that TCF would report him to immigration authorities, humiliate him, or do something violent to him. Without his job, Plaintiff A.S.M. would not be able to provide for his family, so he just took the punishment.

65.     Plaintiff A.S.M.'s fears were well founded. His American coworkers and managers at TCF would routinely make comments about United States Immigration and Customs Enforcement ("ICE") constantly. Managers and coworkers would often make threats about having Plaintiff A.S.M. deported if he was not working fast enough or up to their standards. Even if Plaintiff A.S.M. was not doing anything wrong, these individuals would say that they were going to call ICE on him. Managers would frequently say that they should have all of the undocumented workers, including Plaintiffs, deported. Plaintiff A.S.M. was always worried that if he spoke out or complained they would make a call and take him away.

66.     Plaintiff A.S.M. was bullied and abused just because he was Mexican. American co-workers in the kitchen would complain when he made mistakes calling him a "fucking Latino," a "fucking Mexican," and far worse. They would often call Plaintiff A.S.M. a "donkey" because he was so desperate for money. They would also tell Plaintiff A.S.M. not to speak Spanish.

67.    The managers were always watching and putting extra pressure on Plaintiff A.S.M., and he never felt free. Plaintiff A.S.M. was not allowed to take any breaks during his shifts, including breaks to use the bathroom or to eat. If he tried to go to the bathroom he would immediately be yelled at over the loudspeaker and told to return to his station. Plaintiff A.S.M. still has recurring nightmares about his treatment, especially being forced to work without breaks and being publicly humiliated if he did try to take a break. Plaintiff A.S.M.'s American co-workers, however, were allowed to (and did) take regular breaks.

68.    There was no safety equipment available to him at The Cheesecake Factory, so Plaintiff A.S.M. was injured many times. These included many cuts and burns that have left permanent scarring on Plaintiff A.S.M.'s body.

69.    The only time safety equipment was brought out was when health inspectors were coming. The managers would then give Plaintiff A.S.M. and others cut gloves and sharp knives and tell them to use these items until the health inspectors left. Then TCF took the gloves back, and Plaintiff A.S.M. and others would be given dull knives again so they could keep the other ones sharp for the inspections.

70.    Plaintiff A.S.M. was never paid any form of workers' compensation for any of his injuries, even when he was hospitalized on multiple occasions. He was not paid for the time he took off, for the hospital bills, or even the time spent working on the days he had to leave. On one occasion in 2019, Plaintiff A.S.M. had to continue working after he cut his thumb, and it continued to bleed through the bandage over three days. He was not allowed to go to the hospital for treatment at the instruction of his managers at TCF. When Plaintiff A.S.M. and others were injured in the kitchen, TCF refused to give proper first aid and Plaintiff A.S.M. and others used salt and lemons on cuts to disinfect them.

71.    In 2018 Plaintiff A.S.M. got food poisoning at work. One of Plaintiff A.S.M.'s responsibilities was to prepare various sauces. At TCF, kitchen staff would routinely remove sauces from heat sources, seal them, and place them overnight in refrigerators. This practice created a risk of food borne bacteria. Plaintiff A.S.M. would do his best to learn when TCF staff did this and then discard sauce to avoid serving it to customers and getting the customers sick. On one occasion Plaintiff A.S.M. was working with sauce unaware that it had been placed over night in the refrigerator. When Plaintiff A.S.M. tasted it, he immediately became sick because the sauce had been cooked previously, stored, and was being re-heated. He became so ill that he went to a health clinic in Norristown and was told by medical staff there to go to the hospital. Plaintiff A.S.M. went to Bryn Mawr hospital but did not tell medical staff exactly how he got sick for fear of retaliation from TCF.  When Plaintiff A.S.M. eventually returned to work after being home sick for days, he learned he was not paid for the time he worked on the day he became ill. Plaintiff A.S.M.'s manager told Plaintiff A.S.M. that TCF "doesn't do sick pay."

72.    TCF maintained deplorable working conditions in the kitchen areas where Plaintiff A.S.M. and other undocumented workers had to perform tasks. During the summer the air conditioning often did not work and TCF did not provide fans for kitchen workers. In the winter the heat often did not work, and Plaintiff A.S.M. and other kitchen staff would need to wear winter coats to stay warm. Plaintiff A.S.M. and kitchen staff would put cardboard over the vents just to stop the kitchen from freezing. On one occasion, Plaintiff A.S.M. and other undocumented workers had to work while sewage was actively leaking into the kitchen. It was disgusting and smelled terrible, but Plaintiff A.S.M. and other undocumented workers were forced to continue working while the American workers were sent home due to the conditions. One of Plaintiff A.S.M.'s

fellow undocumented co-workers recorded these conditions on his phone, but managers found out. They forced him to delete any photos or videos of the conditions.

73.    TCF managers and American coworkers would often get very aggressive and fight each other. Plaintiff A.S.M. frequently witnessed these individuals being violent with each other. The constant violence made Plaintiff A.S.M. afraid that they would get violent with him if he ever spoke out or complained, and sometimes they did get violent with him. For example, on one occasion an American coworker threw a hamburger at Plaintiff A.S.M. which hit him in the face when he did not get an order right. The other co-worker was never disciplined for this by TCF. Plaintiff A.S.M. knew that he could not complain or speak out, because events like this would occur without consequence and he would be threatened again with deportation.

74.    Plaintiff A.S.M. was terrified that he could not speak out against what occurred at work or in the kitchen because TCF staff and managers would hold deportation over him and the other undocumented workers all the time.

75.    During the Covid-19 pandemic, undocumented workers at TCF were forced to work in conditions that violated health and safety protocols in place during the lockdown for forty hours or more a week in the restaurant to maintain take out operations. The American workers were not working at this time. During this time period Plaintiff A.S.M. requested from a manager that he be allowed to slightly reduce his hours. He was told by the TCF manager that he was "not allowed" to change or reduce his hours and he had to work at least five days a week to maintain his job and his place in the United States.  After the request, TCF cut his hours completely. Approximately two months later, TCF returned him to the work schedule but only for part time hours as a punishment for him requesting reduced hours.

76.     Plaintiff A.S.M. was required by TCF to sign various documents which were in English despite TCF knowing that Plaintiff A.S.M. did not speak, read, or write English.

77.     Throughout his time at TCF, whether because of the threats made to have him deported, the constant harassment, bullying and abuse, and/or routinely witnessing violence and being in fear of violence being done to him, Plaintiff A.S.M. was in fear that he would suffer psychological, financial, and/or reputational harm if he did not continue working at TCF. Plaintiff A.S.M. knew that TCF had facilitated him getting fraudulent work papers when he was in need of work and money and believed that TCF could and would have him deported if he complained or did not work at TCF despite the conditions.

78.     Plaintiff A.S.M. was terminated on or about March 30, 2022. On March 30, 2022, Plaintiff A.S.M. showed up to work and prepared as usual. After all of the prep was done management started calling undocumented workers into the office one-by-one. Plaintiff A.S.M. was asked by managers, for his "real papers" which confused Plaintiff A.S.M. because he knew, and TCF knew, that TCF had facilitated him obtaining fraudulent work papers from the outset of his employment and he did not have any others. TCF did not pay Plaintiff A.S.M. his last paycheck and removed him immediately from the schedule.

79.     Upon information and belief, eighteen undocumented individuals, including Plaintiffs, were terminated on or about March 30, 2022, when government authorities learned they had been working at TCF using fraudulent documents.

80.     As a direct and proximate result of the conditions and abuse outlined herein, Plaintiff A.S.M. suffered physical and emotional injuries, as more fully set forth in this Complaint. As a result of the conditions and abuse outlined herein, Plaintiff A.S.M. was severely mentally,

psychologically, and emotionally damaged. Plaintiff A.S.M. suffered economic damages including in the form of lost wages and wages that were never paid to him.

81.    Plaintiff A.S.M. has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, including stomach aches, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.

### *Plaintiff Jane Doe M.L.R.M.*

82.    Plaintiff Jane Doe M.L.R.M. ("Plaintiff M.L.R.M.") was born on March 6, 1976 in Mexico. Plaintiff M.L.R.M. was responsible to care for her siblings due to her mother's long work hours and her father's frequent, long-term absences from the home. At age 16 she became pregnant and moved in with the family of the father of her child. She lived with the father of her child for ten years under difficult and abusive conditions.

83.    In 2002, Plaintiff M.L.R.M. decided to leave Mexico in large part to escape the abuse she was suffering from the father of her child. She took her child and crossed the border between Mexico and the United States. She was stopped by authorities shortly after crossing and told to return to Mexico. Later that same year she crossed the border into the United States again and has not returned to Mexico since. She was not authorized by the government to enter the United States.

84.    When Plaintiff M.L.R.M. first arrived in the United States she lived in the area of Chicago, IL. As a result of her working hours and other considerations, after several years Plaintiff M.L.R.M. decided to return her child to Mexico so her child could live with Plaintiff M.L.R.M.'s mother who could be home more frequently to care for the child. Since that time Plaintiff M.L.R.M. has financially supported her child and her remaining family in Mexico which has made

survival here in the United States difficult. In 2008, Plaintiff M.L.R.M. re-located from the Chicago area to Pennsylvania.

85. In 2008, Plaintiff M.L.R.M. learned that The Cheesecake Factory in Willow Grove would hire undocumented workers. She was desperate to make money to send it back to Mexico to support her daughter and to support herself here in the United States. When she arrived for an interview at The Cheesecake Factory in Willow Grove, she was told by a manager that she needed to get fraudulent government documents to work at TCF. She was told by the manager to contact a person by phone and was provided the phone number. She then travelled to Norristown and paid a man $120 and the man gave her fraudulent government documents including a Permanent Resident Card and a Social Security Card. She provided these fraudulent documents to managers at TCF and she started work.

86. When Plaintiff M.L.R.M. first started working at TCF, she was assigned to the salad station. She was being scheduled for approximately 30 hours per week but requested to work more to earn more money to send to her child in Mexico. When this occurred, managers told her she could start coming in earlier and staying later to work more hours. However, unbeknownst to Plaintiff M.L.R.M., these additional early and late hours would not be paid. Instead, managers took advantage of Plaintiff M.L.R.M. and her desire to work more. Managers would clock her in late or clock her out early and not pay her for the additional hours she was working. Each week Plaintiff M.L.R.M. would work at least 15 – 20 hours without pay.

87. When Plaintiff M.L.R.M. first started working at TCF she would have to prepare avocado rolls and cut up to six cases of avocados every day. She was never provided sharp knives or cut gloves unless there was a health inspection. As a result, she suffered numerous cuts and other injuries during her time working at TCF. She was later moved to the pasta station and would

be solely responsible for preparing the days pastas by 11:00 AM every day. This required her to engage in frequent, heavy lifting and caused her to develop a hernia. TCF did not assist her after this injury despite the pain being substantial and the injury impacting Plaintiff M.L.R.M.'s job performance. When Plaintiff M.L.R.M. and others would get cut, they would use lime and salt to help with the injuries because TCF did not offer appropriate first aid. For burns, she would put cold tomatoes on her injury. Sometimes, the bleeding from a cut would not stop and she would have to put 3-4 gloves over her hands to keep working. Plaintiff M.L.R.M. did not feel safe asking for additional aid or help from managers and was forced to return to work immediately after suffering injuries.

88.    In winter, the kitchen at the Cheesecake Factory would get extremely cold because vents in the kitchen would blast in cold air. Plaintiff M.L.R.M. and her coworkers would have to wear winter coats in the kitchen to work. Once Plaintiff M.L.R.M. contracted the flu and was sick for two weeks. She was not given any time off, and her managers forced her to come in and work while sick. Plaintiff M.L.R.M. eventually attempted to go to a medical clinic to seek help. While at the clinic her manager Joe was calling her and telling her she had to come in to work. The next day, she brought Joe a doctor's note, and he ripped it up in front of her and told her that she had to come in the next day to make up for the work she had missed. When she missed work like this, her managers would complain because they would have to put 3-4 other people on her station to do the work she was expected to do and did alone daily.

89.    Plaintiff M.L.R.M. also felt scared while she was working at TCF because the managers and American workers yelled at her and her coworkers all the time and because she was afraid of getting more seriously injured during work. She knew that she could not talk to the

managers, since they were the ones who treated her and her fellow undocumented workers this way and who allowed her American coworkers to treat her badly.

90.    Plaintiff M.L.R.M. was not allowed to take bathroom breaks during her long days in the kitchen. Plaintiff M.L.R.M. and other undocumented workers would only be permitted to use the bathroom after the work was complete. If Plaintiff M.L.R.M. attempted to go to the bathroom, she would be paged over the restaurant's intercom and demanded back to the kitchen. Plaintiff M.L.R.M. found it humiliating to be paged over the intercom for attempting to take a bathroom break, so she stopped trying despite needing to go to the bathroom.

91.    Plaintiff M.L.R.M. was also not allowed to take a break to eat a meal. The restaurant would take around $40 each week from Plaintiff M.L.R.M.'s paycheck for the meals they were supposed to provide. TCF, however, never provided her with any meals, or even time to eat. Early on, Plaintiff M.L.R.M. saw an undocumented coworker hiding in a corner of the kitchen to eat some of the rice that had been prepared. A manager, Roberto, saw her and yelled at her that she could not eat during work hours. After this instance, Plaintiff M.L.R.M. heard other managers say to her and other undocumented workers that if they had time to prepare food for themselves, then they had time to finish their work. Plaintiff M.L.R.M. believed she would get sick if she did not eat during what became 12 – 16 hour shifts, so she would attempt to sneak food into the restaurant and have other undocumented co-workers cover for her so she could try to eat. Despite this, when managers saw her eating, she was harassed and berated. Plaintiff M.L.R.M. felt like an animal for being yelled at just for eating or being hungry.

92.    Several times, the kitchen sinks backed up, and the kitchen flooded with sewage water. On these days, Plaintiff M.L.R.M.'s American coworkers would be dismissed and go home

early but the managers would force her and the other undocumented workers to work in the kitchen with water by their feet.

93.     What Plaintiff M.L.R.M. understood to be her pay rate fluctuated significantly at the Cheesecake Factory. At one point she was making $19 per hour. Then, around 2015 – 2016, a manager named Juan Alvarez decided that Plaintiff M.L.R.M. and the undocumented workers were "making too much" and he lowered her and her coworker's wages to $9 per hour.

94.     In 2015, her manager Jason Kennedy told her that her false work papers had expired and that she had to get new ones. He said that if she got false papers again she could keep her job, but could not keep it if she did not get new fraudulent papers. Jason Kennedy's friend came into the prep area where she was working and took her information and cash to get her new fraudulent documents. Jason Kennedy, the other managers, and all of her other coworkers knew that she was working with false papers. To Plaintiff M.L.R.M.'s knowledge, TCF maintained this second set of fraudulent work papers as she was never given the documents directly.

95.     Plaintiff M.L.R.M. was constantly and consistently threatened with deportation during her time at TCF. By 2020, TCF had twice facilitated her getting false and fraudulent government documents and she was scared and believed that TCF could cause her to be deported. Despite this, the conditions at TCF became overwhelming for Plaintiff M.L.R.M. and in 2020 or 2021 she attempted to quit.  She was scared to meet with her direct manager, Joe, who was known to be (and who Plaintiff M.L.R.M. directly observed being) violent. Instead, she attempted to talk to a general manager about quitting. The general manager led her to a small room in the restaurant where Plaintiff M.L.R.M. saw Joe. Plaintiff M.L.R.M., Joe, and the general manager were in the room. Plaintiff A.A.C. was also present for this meeting to support Plaintiff M.L.R.M. Plaintiff M.L.R.M. felt trapped in the small room where the meeting was to take place. Joe started

screaming and cursing at her and told her that he had already spoken with her and that she "couldn't leave or quit." She did not try to leave again.

96.    During the Covid-19 pandemic, Plaintiff M.L.R.M. contracted Covid-19. She was sick for three weeks but was forced to come in and work. Plaintiff M.L.R.M. knew that preparing food while sick from Covid-19 was not safe, but her managers gave her no other choice.

97.    Plaintiff M.L.R.M. was required by TCF to sign various documents which were in English despite TCF knowing that Plaintiff M.L.R.M. did not speak, read, or write English.

98.    Throughout her time at The Cheesecake Factory, Plaintiff M.L.R.M. faced discrimination and harassment from her American coworkers and managers who knew she was undocumented. She was threatened with phone calls to ICE and the police constantly if she was doing something that her co-workers or managers did not approve of or was not, according to them, working hard enough. Plaintiff M.L.R.M. observed her fellow undocumented coworkers being threatened in the same way. Her managers laughed at jokes her American coworkers made about immigrants and never disciplined them. Her American coworkers always told her and her fellow undocumented coworkers that they did not have any rights. The managers themselves, including Joe and Jason Kennedy, would tell Plaintiff M.L.R.M. and her fellow undocumented co-workers that they did not have any options and because they were immigrants that they had to "put up with what they got."

99.    On or about March 30, 2022, Plaintiff M.L.R.M. went to work early as usual. The environment felt tense, but the managers encouraged her to complete all her prep work as if everything was normal. All of her American coworkers looked at her weirdly, as if they knew something was going to happen. Around 10 – 11 A.M., the managers began calling in all the undocumented workers one-by-one into the office. The managers said they had received a letter

from the government and that they needed "real" work papers from her, even though they had forced her to get false work papers twice already. They told her she was fired, but that she could keep working if she got new papers.

100.    Throughout her time at TCF, whether because of the threats made to have her deported, the constant harassment, bullying, and abuse, and/or routinely witnessing violence and being in fear of violence being done to her, Plaintiff M.L.R.M. was in fear that she would suffer psychological, financial, and/or reputational harm if she did not continue working at TCF. Plaintiff M.L.R.M. knew that TCF had facilitated her getting fraudulent work papers and believed that TCF could and would have her deported if she complained or did not work at TCF under poor and abusive conditions.

101.    As a direct and proximate result of the conditions and abuse outlined herein, Plaintiff M.L.R.M. suffered physical and emotional injuries, as more fully set forth in this Complaint. As a result of the conditions and abuse outlined herein, Plaintiff M.L.R.M. was severely mentally, psychologically, and emotionally damaged. Plaintiff M.L.R.M. suffered economic damages including in the form of lost wages and wages that were never paid to him.

102.    Plaintiff M.L.R.M. has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, including stomach aches, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.

### Plaintiff Jane Doe E.R.R.

103.    Plaintiff Jane Doe E.R.R. ("Plaintiff E.R.R.") was born on September 2, 1986, in San Antonio Tlatenco Chiauzingo, Puebla, Mexico. Beginning in high school Plaintiff E.R.R. worked in a clothing factory. She would start work as soon as she was done her school day. When she graduated high school, she began to work full time to help support her family. When she

worked full time, she would work ten hours a day, six days a week. She would make approximately 600-700 pesos for 60 hours of work, which is roughly $30 U.S. dollars.

104.    In 2006 she decided to leave Mexico for the United States. That year she crossed the border into the United States. She was not authorized by the government to enter the United States. She first lived in the area of Chicago, IL before moving to Warrington, PA. She has not returned to Mexico since crossing the border in 2006.

105.    Beginning on April 8, 2012, until March 30, 2022, Plaintiff E.R.R. worked at TCF Willow Grove. During her time there, TCF stole her wages, verbally abused her, and endangered her health. She applied for the job at TCF after hearing that TCF would hire undocumented workers.

106.    Before Plaintiff E.R.R. was hired, she was interviewed by Jason Kennedy, a manager. Knowing she needed the work and money but was undocumented, Kennedy told her to contact one of his friends who made fake social security cards and other government documents. Plaintiff E.R.R. does not remember the name of Kennedy's friend, but Kennedy made a lot of workers buy fake and fraudulent government documents from this person. Plaintiff E.R.R. paid the man money for a social security card in a make-shift office space inside TCF where the chefs would place orders for produce. Kennedy's friend gave her the social security card, and she gave it to Kennedy.

107.    During her time at TCF, Plaintiff E.R.R. was required to work hours for which she was not paid. She was required to come in early and leave late, with the beginning and end of her shifts being off the clock because managers would clock her out while she was working. Hispanic workers were called "donkeys" by TCF employees because they were forced to work more hours and do more labor-intensive tasks than the American workers. For example, American workers

were allowed to leave at 5 p.m., but the other undocumented workers and Plaintiff E.R.R. would not be allowed to go home until the kitchen was deep cleaned, including the fryers, stove, and workstations which was roughly around 7 p.m. Plaintiff E.R.R. was expected to show up early to my shift to prep the kitchen. Because of this, Plaintiff E.R.R. would end up working more than 60 hours a week.

108.    Plaintiff E.R.R. was not permitted to take breaks, including bathroom breaks. If she tried to leave her station, management would yell at her over an intercom. Managers were constantly watching Plaintiff E.R.R. through the service window to see if she or other undocumented workers would leave their station. If management saw this, they would use the intercom to yell at Plaintiff E.R.R. and other undocumented works to "get back to work." This humiliated Plaintiff E.R.R. and the other undocumented workers.

109.    On one occasion, Plaintiff E.R.R. was given too much work for one individual to accomplish, and she attempted to ask her manager, Joe, for help. He yelled and cursed at her to the point that she broke down in tears in front of her co-workers. Joe then forced her to sign what she understood to be a disciplinary form which was written in English and that Plaintiff E.R.R. could not read.

110.    Plaintiff E.R.R. was subjected to frequent verbal harassment and abuse regarding her national origin, race, and immigration status. American co-workers and managers would yell at her to "go back to Mexico" and that she and other undocumented workers (referred to as "fucking Mexicans") "were stealing jobs." Plaintiff E.R.R. was constantly referred to as an "illegal" and told by American coworkers and management that they would call ICE to deport her if she was out of line or did something they did not approve of.

111.    Tired of the treatment she was forced to endure, in 2015, Plaintiff E.R.R. attempted to quit. She decided to meet with her manager, Jason Kennedy, and give him a letter of resignation. When she informed Kennedy of the purpose of the meeting and gave him the letter, he started yelling at her, saying she cannot quit. He ripped the letter up right in front of her face. Plaintiff E.R.R. was scared that he might become violent. Kennedy was physically bigger than her and Plaintiff E.R.R. witnessed him getting into screaming matches with her co-workers. Knowing that Kennedy was the person to have provided her with her papers, the constant harassment from managers and co-workers about reporting her to ICE, and based on Kennedy's reaction to her attempt at leaving, Plaintiff E.R.R. decided she would just keep coming to work at TCF.

112.    Plaintiff E.R.R. suffers from rheumatoid arthritis. She knew from experience that management at TCF would not let undocumented people take off work due to illness or personal health. For any undocumented worker that did not work as scheduled due to health concerns, management would punish them by not scheduling them for work for several days or longer after they were healthy in order to punish them for taking off work in the first place. On several occasions, Plaintiff E.R.R.'s arthritis was so bad that she was physically incapable of working. She would show managers her hands and that she could not physically complete work. Managers told her she must work or they would not schedule her for a longer period of time as punishment. Plaintiff E.R.R.'s arthritis worsened by the TCF working conditions that were at times excessively hot and at other times excessively cold.  Plaintiff E.R.R. now receives two injections a month as treatment for the arthritis pain she continues to have today.

113.    In January 2013 a manager, Marcos, threw open a refrigerator door while Plaintiff E.R.R. was walking past. The force caused her the fall backwards and injure her back and chest. Despite being in immense pain she did not seek medical attention until after her work ended for

fear of retaliation by TCF. She did eventually seek medical attention and was diagnosed with a chest contusion and lumbar strain and was unable to work. TCF only allowed Plaintiff E.R.R. two weeks unpaid to recover and did not pay the hospital bill. Despite being under medical restrictions for work, Plaintiff E.R.R. was forced at TCF to maintain her typical workload. Her recovery from this injury was greatly prolonged because management at TCF did not provide her accommodations based on her injury. The physical strain of her work after being injured was so bad that on one occasion she fainted and collapsed in the kitchen. The same person that injured her in the first place, Marcos, ran into Plaintiff E.R.R. again shortly after hitting her with the refrigerator door, aggravating her injury. Plaintiff had to go back to the hospital, but TCF again would not pay her medical bill. Marcos became enraged when she was injured again and could not physically perform her work. Despite the second injury, TCF did not allow her any time off from working. Plaintiff E.R.R. still suffers from the effects of these injuries to this day.

114.    TCF denied Plaintiff E.R.R. and other undocumented workers access to cut gloves or sharpened knives that lead to many injuries, including cuts. In one instance, Plaintiff E.R.R. cut her left thumb and needed to go to the hospital for stitches. She asked for a ride to the hospital, but TCF management did not allow that. TCF management made Plaintiff E.R.R. come straight back after receiving the stitches and continue working. TCF would only provide appropriate cut gloves or sharpened knives when inspectors came to look at the kitchen.

115.    At least three times during Plaintiff E.R.R.'s time at TCF, the drainage pipes from the dishwasher station would back up and flood the kitchen with sewage water. The sewage water flooded the kitchen, but management forced Plaintiff E.R.R. and the undocumented workers at TCF to keep working, telling them to make sure the sewage water stays in the kitchen and does not reach the customers' view.

116.    Plaintiff E.R.R. was required by TCF to sign various documents which were in English despite TCF knowing that Plaintiff E.R.R. did not speak, read, or write English.

117.    On or about March 30, 2022, Plaintiff E.R.R. started her shift working at the sandwich station. Her manager, Jessica Hofacker, came into the restaurant with a stack of documents. She gave Plaintiff E.R.R. a weird look. Plaintiff E.R.R. immediately knew something was wrong, but did not know what. Starting at noon, management began calling undocumented workers in one-by-one and firing them.

118.    Plaintiff E.R.R. was called into the office and told she could no longer work until she provided legitimate work documents. She was shocked and confused because TCF knew she did not have any papers because they were the ones who instructed her to get a fake social security card in the first place.

119.    After being terminated Plaintiff E.R.R. ran into a person named Chris, another Cheesecake Factory manager, who told her that if she brought new fake documents under a new name, TCF would re-hire her. She felt confused, frustrated, and betrayed.

120.    Throughout her time at TCF, whether because of the threats made to have her deported, the constant harassment, bullying, and abuse, and/or routinely witnessing violence and being in fear of violence being done to her, Plaintiff E.R.R. was in fear that she would suffer psychological, financial, and/or reputational harm if she did not continue working at TCF. Plaintiff E.R.R. knew that TCF had facilitated her getting fraudulent work papers and believed that TCF could and would have her deported if she complained or did not work at TCF under poor and abusive conditions.

121.    As a direct and proximate result of the conditions and abuse outlined herein, Plaintiff E.R.R. suffered physical and emotional injuries, as more fully set forth in this Complaint.

As a result of the conditions and abuse outlined herein, Plaintiff E.R.R. was severely mentally, psychologically, and emotionally damaged. Plaintiff E.R.R. suffered economic damages including in the form of lost wages and wages that were never paid to him.

122.    Plaintiff E.R.R. has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, including stomach aches, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.

### *Plaintiff Jane Doe E.G.P.*

123.    Plaintiff Jane Doe E.G.P. ("Plaintiff E.G.P.") was born on November 30, 1992, in Tenacingo, Tlexcala, Mexico. Where Plaintiff E.G.P. was born is a community where many people suffer a life of poverty, violent criminal gangs, drug crimes, delinquency, and trafficking. She began working at ten years old, though it was difficult for her to find work.

124.    Plaintiff E.G.P. decided to leave Mexico for the United States in 2010. She crossed the border between Mexico and the United States when she was seventeen years old. She was not authorized by the government to enter the United States. The people she crossed with were going to settle in Pennsylvania and she joined them on the journey, arriving in May 2010.

125.    In 2011, Plaintiff E.G.P. was at the Willow Grove Mall. She was approached by two men, one she later learned to be TCF manager Jason Kennedy, who asked her if she needed to work. They provided her with business cards and asked her if she had work papers. She told them no, but they said to come visit them at TCF and they could help her get papers. She did just that as she was in need of money and work, provided the managers with her information and $180. TCF contacted Plaintiff E.G.P. the next day and told her they had her papers and she could come to work the next day. TCF gave her a Permanent Resident Card and a Social Security Card with

her information on it. On at least one other occasion, TCF told her that her work papers were expired and she followed the same process to get new fraudulent papers.

126.    When Plaintiff E.G.P. first started working she prepared appetizers. While her American co-workers were given cut gloves and sharp knives she was not given cut gloves and her knives were old and dull causing her to frequently cut herself. She was also frequently burned from the pizza oven or deep fryer because she was not properly trained how to handle the dangerous equipment.

127.    Plaintiff E.G.P. was constantly harassed by management and singled out when compared to her American coworkers. One manager, Joe, constantly screamed at her for not performing up to his standards, even though her American coworkers routinely failed to meet his standards. Jason Kennedy escalated the harassment and abuse. While he would yell and scream at her, he would also throw things at her including food, silverware, and dishes. Plaintiff E.G.P. would suffer injuries from having these items thrown at her. She did not respond to this abuse because of the frequent commentary that managers and American coworkers would get Plaintiff E.G.P. and other undocumented workers deported. Plaintiff E.G.P. lived in constant fear that those working at TCF would cause her to get deported.

128.    Plaintiff E.G.P. was routinely forced to work hours before and after her scheduled shift. Though she would be scheduled and compensated for approximately 40 hours per week, she was routinely forced by management to work 60 or more hours per week. Management controlled when she was clocked in and clocked out and so they would clock her in late or clock her out early while she was still working.

129.    Plaintiff E.G.P. was not permitted to take bathroom or meal breaks. She would be yelled at and harassed if she attempted to do either.

130.    The working conditions were made even worse when the plumbing broke and flooded the toilets. The water from the flooding rushed into the kitchen, and caused Plaintiff E.G.P.'s socks to get wet and the smell became unbearable to work in. Nonetheless, Plaintiff E.G.P. still had to work in these conditions despite management allowing her American coworkers to leave as soon as the flooding began. She had to work while waiting for maintenance to come clean up the floors. When she spoke up about not wanting to work in these disgusting conditions, Jason Kennedy yelled at her and said that he had a contract over her, so she had to work under any conditions they demanded her to work under. At the same time, Plaintiff E.G.P. was aware of the constant threats of deportation from management and her American coworkers.

131.    Plaintiff E.G.P. felt trapped and fearful at work but continued to show up every day because she kept thinking about how TCF knew about her fraudulent papers and could have her sent back to Mexico and withhold money she had earned.

132.    Plaintiff E.G.P. was required by TCF to sign various documents which were in English despite TCF knowing that Plaintiff E.G.P. did not speak, read, or write English.

133.    Plaintiff E.G.P. was terminated on or about March 30, 2022. Her manager confronted her with the papers that she used when she was hired and told her that he knew she did not have legal papers because he is the one who provided her with those papers. Her manager then threatened her, telling her that she did not have documentation, so she felt like she had no choice but to leave.

134.    Throughout her time at TCF, whether because of the threats made to have her deported, the constant harassment, bullying, and abuse, and/or routinely witnessing violence and being in fear of violence being done to her, Plaintiff E.G.P. was in fear that she would suffer psychological, financial, and/or reputational harm if she did not continue working at TCF. Plaintiff

E.G.P. knew that TCF had facilitated her getting fraudulent work papers and believed that TCF could and would have her deported if she complained or did not work at TCF under poor and abusive conditions.

135.    As a direct and proximate result of the conditions and abuse outlined herein, Plaintiff E.G.P. suffered physical and emotional injuries, as more fully set forth in this Complaint. As a result of the conditions and abuse outlined herein, Plaintiff E.G.P. was severely mentally, psychologically, and emotionally damaged. Plaintiff E.G.P. suffered economic damages including in the form of lost wages and wages that were never paid to her.

136.    Plaintiff E.G.P. has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, including stomach aches, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.

### *Plaintiff John Doe A.A.C.*

137.    Plaintiff John Doe A.A.C. ("Plaintiff A.A.C.") was born on November 26, 1980 in Mexico. He started working at the age of six after school and during scheduled breaks from school. He worked jobs out in the fields that involved heavy labor. When he finished elementary school he went to work full time because his father lost his job and Plaintiff A.A.C. needed to help support his family.

138.    In 2007 he decided to leave Mexico and travel to the United States. He was not authorized by the government to enter the United States and crossed the border. He eventually arrived in Norristown, PA and has not returned to Mexico since.

139.    In December 2012, Plaintiff A.A.C. met TCF manager Jason Kennedy after learning that The Cheesecake Factory in Willow Grove would hire undocumented workers. Needing work and money, he met with Kennedy who told Plaintiff A.A.C. that he needed papers

to work at TCF and that Kennedy could help get them for Plaintiff A.A.C. Kennedy told Plaintiff A.A.C. to meet with a man in a car outside TCF Willow Grove in the parking lot. Plaintiff A.A.C. paid the man $120. TCF contacted Plaintiff A.A.C. and told him that they had received the fraudulent documents and he could begin working. At one point Plaintiff A.A.C. was told he needed to renew his documents and followed the same process, meeting with a man in the parking lot of TCF Willow Grove and paying him cash. The only difference was that Plaintiff A.A.C. did not need to provide any information since the man already had it from the first time he met with Plaintiff A.A.C.

140.    After he started working at The Cheesecake Factory, Plaintiff A.A.C. was frequently harassed by management and his American co-workers and was singled out by management compared to his American co-workers. He would get cursed at and yelled at by managers and his American co-workers. He would have food thrown at him when he allegedly did not work up to standards that TCF management set.

141.    Plaintiff A.A.C. was not permitted to take bathroom or meal breaks while he was working. He would be yelled at and harassed if he attempted to do either. Plaintiff A.A.C. was routinely forced to work hours before and after his scheduled shifts. While he was typically scheduled and compensated for approximately 40 hours or work per week, he was routinely forced by management to work 60 or more hours per week. Management would routinely not clock him in when he actually arrived and then clock him out early while he was still working.

142.    Plaintiff A.A.C. was often told by management and American co-workers that they would report him to immigration authorities if he did something wrong or was not working as hard or as fast as they thought he should be working. Plaintiff A.A.C. lived in fear of being deported and believed that TCF's threats were real and that he would get deported. Plaintiff A.A.C. was

terrified that he could not speak out against what occurred at work or in the kitchen because TCF staff and managers would constantly threaten Plaintiff A.A.C. and the other undocumented workers that they would contact authorities and have them deported. During the first administration of President Donald J. Trump, the threats to deport Plaintiff A.A.C. increased in frequency and severity, instilling increased fear and anxiety in Plaintiff A.A.C. that if he complained or resisted the working conditions that he would be deported.

143. During the Covid-19 pandemic, undocumented workers, including Plaintiff A.A.C., at TCF were forced to work in conditions that violated health and safety protocols in place during the lockdown for forty hours or more a week in the restaurant to maintain take out operations. The American workers were not required to work (and were not working) at this time.

144. Plaintiff A.A.C. continued working at TCF under these conditions because he believed that either TCF would report him to immigration and cause him to be deported or it would be impossible to find other work because of the fake and fraudulent documents that TCF had procured for him.

145. Plaintiff A.A.C. was required by TCF to sign various documents which were in English despite TCF knowing that Plaintiff A.A.C. did not speak, read, or write English.

146. Plaintiff A.A.C. was terminated on or about March 30, 2022. His manager called him into an office and told him that if he could not provide legitimate working papers that he could no longer work at TCF.

147. Throughout his time at TCF, whether because of the threats made to have him deported, the constant harassment, bullying, and abuse, and/or routinely witnessing violence and being in fear of violence being done to him, Plaintiff A.A.C. was in fear that he would suffer psychological, financial, and/or reputational harm if he did not continue working at TCF. Plaintiff

A.A.C. knew that TCF had facilitated him getting fraudulent work papers and believed that TCF could and would have him deported if he complained or did not work at TCF despite the conditions.

148.    As a direct and proximate result of the conditions and abuse outlined herein, Plaintiff A.A.C. suffered physical and emotional injuries, as more fully set forth in this Complaint. As a result of the conditions and abuse outlined herein, Plaintiff A.A.C. was severely mentally, psychologically, and emotionally damaged. Plaintiff A.A.C. suffered economic damages including in the form of lost wages and wages that were never paid to him.

149.    Plaintiff A.A.C. has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, including stomach aches, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.

## COUNT I – CONDUCT IN VIOLATION OF THE TRAFFICKING VICTIM PROTECTION REAUTHORIZATION ACT, 18 U.S.C. § 1589

### Plaintiffs v. Defendants

150.    Plaintiffs incorporate herein by reference the paragraphs above, as if set forth herein in their entirety.

151.    Pursuant to 18 U.S.C. § 1589, all who knowingly obtain labor or services through force, threats of force, fraud, and coercion are guilty of severe forms of trafficking in persons and forced labor. This includes, at a minimum, *both* the "traffickers" who recruit, harbor, transport, and provide individuals for forced labor *and* those who knowingly benefit, financially or by receiving anything of value, from participating in a venture which has engaged in the providing or obtaining of labor or services though force, threats of force, fraud and coercion, knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor services by any of such means.

152.    Pursuant to 22 U.S.C. § 7102, anyone who has been subject to the recruitment, harboring, transportation, provision, or obtaining of their labor or services through the use of force, fraud, or coercion is a victim of forced labor and trafficking.

153.    Pursuant to 18 U.S.C. § 1589 it is unlawful for any person or entity to

    a.    knowingly provide or obtain the labor or services of a person by any one of, or by any combination of, the following:

        1.    by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

        2.    by means of serious harm or threats of serious harm to that person or another person;

        3.    by means of the abuse or threatened abuse of law or legal process; or

        4.    by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint

154.    Severe forms of forced labor are defined by the Trafficking Victim Protection Reauthorization Act ("TVPRA") under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."

155.    Pursuant to 18 U.S.C. § 1595, an individual who is a victim of a violation of 18 U.S.C. §§ 1589 or 1590 (or any other violation of 18 U.S.C., Chapter 77, Part I – Peonage, Slavery, and Trafficking in Persons)  may bring a civil action against any person or entity who violates Chapter 77 (trafficker liability) or any person or entity that knowingly benefits, or attempts or

conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of Chapter 77 (beneficiary liability) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

156.    All of the Plaintiffs were trafficking by means of force, fraud, or coercion; force, threats of force, physical restraint, and/or threats of physical restraint; by means of serious harm and/or threats of serious harm; and/or by means of the abuse or threatened abuse of law or legal process; and/or by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

157.    Plaintiff John Doe A.S.M. is a victim of forced labor within the meaning of 18 U.S.C. § 1589 and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

158.    Plaintiff Jane Doe M.L.R.M. is a victim of forced labor within the meaning of 18 U.S.C. § 1589 and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

159.    Plaintiff Jane Doe E.R.R. is a victim of forced labor within the meaning of 18 U.S.C. § 1589 and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

160.    Plaintiff Jane Doe E.G.P. is a victim of forced labor within the meaning of 18 U.S.C. § 1589 and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

161.    Plaintiff John Doe A.A.C. is a victim of forced labor within the meaning of 18 U.S.C. § 1589 and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

162.    Defendants were aware of their obligation and duty not to violate 18 U.S.C. § 1589 but, through their acts and omissions, did violate 18 U.S.C. § 1589.

163.    The actions, omissions, and/or commissions alleged against Defendants in this pleading were the but-for and proximate cause of Plaintiffs' injuries and damages.

164.    Plaintiffs have suffered substantial physical, psychological, economic, financial, reputational, and other injuries as a result of exploited by Defendants in violation of 18 U.S.C. § 1589.

## COUNT II – CONDUCT IN VIOLATION OF THE TRAFFICKING VICTIM PROTECTION REAUTHORIZATION ACT, 18 U.S.C. § 1590

### Plaintiffs v. Defendants

165.    Plaintiffs incorporate herein by reference the paragraphs above, as if set forth herein in their entirety.

166.    Pursuant to 22 U.S.C. § 7102, anyone who has been subject to the recruitment, harboring, transportation, provision, or obtaining of their labor or services through the use of force, fraud, or coercion is a victim of forced labor and trafficking.

167.    Pursuant to 18 U.S.C. § 1590 it is unlawful for any person or entity to knowingly recruit, harbor, transport, provide, or obtain by any means, any person for labor or services in violation of Chapter 77.

168.    Severe forms of forced labor are defined by the Trafficking Victim Protection Reauthorization Act ("TVPRA") under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."

169.    Pursuant to 18 U.S.C. § 1595, an individual who is a victim of a violation of 18 U.S.C. §§ 1589 or 1590 (or any other violation of 18 U.S.C., Chapter 77, Part I – Peonage, Slavery, and Trafficking in Persons) may bring a civil action against any person or entity who violates

Chapter 77 (perpetrator liability) or any person or entity that knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of Chapter 77 (beneficiary liability) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

170.    All of the Plaintiffs were trafficking by means of force, fraud, or coercion; force, threats of force, physical restraint, and/or threats of physical restraint; by means of serious harm and/or threats of serious harm; and/or by means of the abuse or threatened abuse of law or legal process; and/or by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

171.    Plaintiff John Doe A.S.M. is a victim of forced labor trafficking within the meaning of 18 U.S.C. § 1590 and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

172.    Plaintiff Jane Doe M.L.R.M. is a victim of forced labor trafficking within the meaning of 18 U.S.C. § 1590 and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

173.    Plaintiff Jane Doe E.R.R. is a victim of forced labor trafficking within the meaning of 18 U.S.C. § 1590 and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

174.    Plaintiff Jane Doe E.G.P. is a victim of forced labor trafficking within the meaning of 18 U.S.C. § 1590 and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

175.    Plaintiff John Doe A.A.C. is a victim of forced labor trafficking within the meaning of 18 U.S.C. § 1590 and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

176.    Defendants were aware of their obligation and duty not to violate 18 U.S.C. § 1589 but, through their acts and omissions, did violate 18 U.S.C. § 1590.

177.    The actions, omissions, and/or commissions alleged against Defendants in this pleading were the but-for and proximate cause of Plaintiffs' injuries and damages.

178.    Plaintiffs have suffered substantial physical, psychological, economic, financial, reputational, and other injuries as a result of exploited by Defendants in violation of 18 U.S.C. § 1590.

### COUNT III – BENEFITTING FROM A LABOR TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIM PROTECTION REAUTHORIZATION ACT, 18 U.S.C. § 1589

### Plaintiffs v. Defendants

179.    Plaintiffs incorporate herein by reference the paragraphs above, as if set forth herein in their entirety.

180.    Pursuant to 18 U.S.C. § 1589, all who knowingly obtain labor or services through force, threats of force, fraud, and coercion are guilty of severe forms of trafficking in persons and forced labor. This includes, at a minimum, *both* the "traffickers" who recruit, harbor, transport, and provide individuals for forced labor *and* those who knowingly benefit, financially or by receiving anything of value, from participating in a venture which has engaged in the providing or obtaining of labor or services though force, threats of force, fraud and coercion, knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor services by any of such means.

181.    Pursuant to 22 U.S.C. § 7102, anyone who has been subject to the recruitment, harboring, transportation, provision, or obtaining of their labor or services through the use of force, fraud, or coercion is a victim of forced labor and trafficking.

182.    Pursuant to 18 U.S.C. § 1589 it is unlawful for any person or entity to

a.   Knowingly benefit, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; by means of serious harm or threats of serious harm to that person or another person; by means of the abuse or threatened abuse of law or legal process; or by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means.

183.    Severe forms of forced labor are defined by the Trafficking Victim Protection Reauthorization Act ("TVPRA") under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."

184.    Pursuant to 18 U.S.C. § 1589 liability arises for entities who: (1) knowingly benefitted financially or by receiving anything of value (2) from participation in a venture (3) it knew or should have known was engaged in forced labor.

185.    Pursuant to 18 U.S.C. § 1595, an individual who is a victim of a violation of 18 U.S.C. §§ 1589 or 1590 (or any other violation of 18 U.S.C., Chapter 77, Part I – Peonage, Slavery, and Trafficking in Persons)  may bring a civil action against any person or entity who violates Chapter 77 (perpetrator liability) or any person or entity that knowingly benefits, or attempts or

conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of Chapter 77 (beneficiary liability) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

186.    Defendants' acts, outlined above, constitute a violation of 18 U.S.C. § 1589. Specifically, Defendants had a statutory obligation not to participate in or benefit from a venture that they knew, or should have known, was engaged in violations of 18 U.S.C. § 1589. At all relevant times, Defendants breached this duty by participating in, and facilitating, the providing or obtaining of labor or services from Plaintiffs by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; and/or by means of serious harm or threats of serious harm to that person or another person; and/or by means of the abuse or threatened abuse of law or legal process; and/or by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

187.    Defendants knew, or were in reckless disregard of the fact, that the venture was engaged in the providing or obtaining of labor or services from Plaintiffs by the above described means.

188.    Defendants have financially benefitted as a result of these acts, omissions, and/or commissions by their participation in the owning and operation of TCF restaurants, including TCF Willow Grove, while providing and/or obtaining forced labor services from Plaintiffs using the above-described means. Defendants financially benefitted and profited from this venture, including through the provision of fraudulent government documents to facilitate Plaintiffs to provide forced labor services to Defendants.

189.    All of the Plaintiffs were trafficking by means of force, fraud, or coercion; force, threats of force, physical restraint, and/or threats of physical restraint; by means of serious harm and/or threats of serious harm; and/or by means of the abuse or threatened abuse of law or legal process; and/or by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

190.    Plaintiff John Doe A.S.M. is a victim of forced labor within the meaning of 18 U.S.C. § 1589 and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

191.    Plaintiff Jane Doe M.L.R.M. is a victim of forced labor within the meaning of 18 U.S.C. § 1589 and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

192.    Plaintiff Jane Doe E.R.R. is a victim of forced labor within the meaning of 18 U.S.C. § 1589 and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

193.    Plaintiff Jane Doe E.G.P. is a victim of forced labor within the meaning of 18 U.S.C. § 1589 and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

194.    Plaintiff John Doe A.A.C. is a victim of forced labor within the meaning of 18 U.S.C. § 1589 and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

195.    Defendants' conduct was in, or affected, interstate and/or foreign commerce. Defendants knowingly benefited from participation in what they knew or should have known was a forced labor trafficking venture, in violation of 18 U.S.C. § 1589.

196.    Defendants' employees and agents had actual knowledge or should have known that they were facilitating and participating in a scheme to profit from a venture involved in forced labor trafficking.

197.    Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1589.

198.    The actions, omissions, and/or commissions alleged against Defendants in this pleading were the but-for and proximate cause of Plaintiffs' injuries and damages.

199.    Plaintiffs have suffered substantial physical, psychological, economic, financial, reputational, and other injuries as a result of exploited by Defendants in violation of 18 U.S.C. § 1589.

## COUNT IV – CONDUCT IN VIOLATION OF THE HUMAN TRAFFICKING ACT, 18 Pa. C.S.A. § 3012

### Plaintiffs v. Defendants

200.    Plaintiffs incorporate herein by reference the paragraphs above, as if set forth herein in their entirety.

201.    Pursuant to 18 Pa. C.S.A. § 3012, it is unlawful for any person or entity to knowingly subject an individual to labor servitude by any of the following means:

a.  Causing or threatening to cause serious harm to any individual.

b.  Physically restraining or threatening to physically restrain another individual.

c.  Kidnapping or attempting to kidnap any individual.

d.  Abusing or threatening to abuse the legal process.

e.  Taking or retaining the individual's personal property or real property as a means of coercion.

f.  Engaging in unlawful conduct with respect to documents, as defined in section 3014 (relating to unlawful conduct regarding documents).

g.  Extortion.

h.  Fraud.

i.   Criminal coercion, as defined in section 2906 (relating to criminal coercion).

j.   Duress, through the use of or threat to use unlawful force against the person or another.

k.   Debt coercion.

l.   Facilitating or controlling the individual's access to a controlled substance.

m.   Using any scheme, plan or pattern intended to cause the individual to believe that, if the individual does not perform the labor, services, acts or performances, that individual or another individual will suffer serious harm or physical restraint.

202.   Pursuant to 18 Pa. C.S.A. § 3051, an individual who is a victim of human trafficking may bring a civil action against any person that participated in the human trafficking of the individual and is entitled to (1) actual damages, (2) compensatory damages, (3) punitive damages, (4) injunctive relief, (5) any other appropriate relief, (6) attorneys fees, and (7) costs.

203.   Plaintiff John Doe A.S.M. is a victim of human trafficking within the meaning of 18 Pa. C.S.A. § 3012 and is therefore entitled to bring a civil action under 18 Pa. C.S.A. § 3051.

204.   Plaintiff Jane Doe M.L.R.M. is a victim of human trafficking within the meaning of 18 Pa. C.S.A. § 3012 and is therefore entitled to bring a civil action under 18 Pa. C.S.A. § 3051.

205.   Plaintiff Jane Doe E.R.R. is a victim of human trafficking within the meaning of 18 Pa. C.S.A. § 3012 and is therefore entitled to bring a civil action under 18 Pa. C.S.A. § 3051.

206.   Plaintiff Jane Doe E.G.P. is a victim of human trafficking within the meaning of 18 Pa. C.S.A. § 3012 and is therefore entitled to bring a civil action under 18 Pa. C.S.A. § 3051.

207.   Plaintiff John Doe A.A.C. is a victim of human trafficking within the meaning of 18 Pa. C.S.A. § 3012 and is therefore entitled to bring a civil action under 18 Pa. C.S.A. § 3051.

208.    Defendants are liable pursuant to 18 Pa. C.S.A. § 3012 and 18 Pa. C.S.A. § 3051 for their own actions, omissions, and/or commissions, including but not limited to participating in the human trafficking of Plaintiffs by means of causing or threatening to cause serious harm to any individual, abusing or threatening to abuse the legal process, fraud, duress, and/or using any scheme, plan or pattern intended to cause the individual to believe that, if the individual does not perform the labor, services, acts or performances, that individual or another individual will suffer serious harm.

209.    The actions, omissions, and/or commissions alleged against Defendants in this pleading were the but-for and proximate cause of Plaintiffs' injuries and damages.

210.    Plaintiffs have suffered substantial physical, psychological, economic, financial, reputational, and other injuries as a result of exploited by Defendants in violation of 8 Pa. C.S.A. § 3012.

## **COUNT V – Title VII**

## **Plaintiffs v. Defendants**

211.    Plaintiffs incorporate herein by reference the paragraphs above, as if set forth herein in their entirety.

212.    By committing the foregoing acts of discrimination, retaliation, and harassment against Plaintiffs, Defendants violated Title VII.

213.    Plaintiffs' national origin and/or race was a motivating and determinative factor in Defendants' discriminatory treatment of Plaintiffs.

214.    Plaintiffs' national origin and/or race was a motivating and determinative factor in Defendants' termination of Plaintiffs.

215.    Plaintiffs were discriminated against by Defendants based on their national origin and/or race.

216.    Plaintiffs were subject to discrimination by Defendants by way of, including but not limited to, their training, compensation, and working conditions.

217.    Plaintiffs were subject to a hostile work environment due to the acts and omission of Defendants. Defendants created and controlled a work environment that was permeated with discriminatory intimidation, ridicule, and insult against Plaintiffs.

218.    Plaintiffs were discriminated and retaliated against on the basis of their national origin and/or race when they were all terminated on or about March 30, 2022.

219.    Defendants created and controlled a hostile work environment that was sufficiently severe and/or pervasive so as to alter the conditions of Plaintiffs' employment with Defendants.

220.    Defendants' mistreatment of Plaintiffs was not welcomed by Plaintiffs.

221.    The conduct to which Plaintiffs were subjected was so severe and/or pervasive that a reasonable person in Plaintiffs position would find the work environment to be hostile and/or abusive.

222.    Defendants failed to remedy or prevent the national origin and/or race discrimination, harassment, and retaliation against Plaintiffs.

223.    Defendants acted with malice or a reckless indifference to Plaintiffs' rights, thereby warranting the imposition of punitive damages.

224.    As a direct and proximate result of Defendants' violation of Title VII, Plaintiffs have suffered the damages and losses set forth herein including but not limited to substantial physical, psychological, economic, financial, reputational, and other injuries.

225.    Plaintiffs are entitled to all costs and attorneys' fees incurred as a result of the unlawful behavior complained of herein.

226.    Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of the unlawful behavior complained of herein unless and until this Court grants the relief requested herein.

227.    No previous application has been made for the relief requested herein.

## COUNT VI – PHRA

### Plaintiffs v. Defendants

228.    Plaintiffs incorporate herein by reference the paragraphs above, as if set forth herein in their entirety.

229.    By committing the foregoing acts of discrimination, retaliation, and harassment against Plaintiffs, Defendants violated the PHRA.

230.    Plaintiffs were discriminated against by Defendants based on their national origin and/or race.

231.    Plaintiffs were subject to discrimination by Defendants by way of, including but not limited to, their training, compensation, hire, tenure, terms, conditions and/or privileges of employment and/or contract.

232.    Plaintiffs were subject to a hostile work environment due to the acts and omission of Defendants. Defendants created and controlled a work environment that was permeated with discriminatory intimidation, ridicule, and insult against Plaintiffs.

233.    Defendants created and controlled a hostile work environment that was sufficiently severe and/or pervasive so as to alter the conditions of Plaintiffs' employment with Defendants.

234.    Plaintiffs were discriminated and retaliated against on the basis of their national origin and/or race when they were all terminated on or about March 30, 2022.

235.    Defendants' mistreatment of Plaintiffs was not welcomed by Plaintiffs.

236.    The conduct to which Plaintiffs were subjected was so severe and/or pervasive that a reasonable person in Plaintiffs position would find the work environment to be hostile and/or abusive.

237.    Defendants failed to remedy or prevent the national origin and/or race discrimination, harassment, and retaliation against Plaintiffs.

238.    Defendants acted with malice or a reckless indifference to Plaintiffs' rights, thereby warranting the imposition of punitive damages.

239.    Plaintiffs are entitled to all costs and attorneys' fees incurred as a result of the unlawful behavior complained of herein.

240.    Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of the unlawful behavior complained of herein unless and until this Court grants the relief requested herein

241.    As a direct and proximate result of Defendants' violation of the PHRA, Plaintiffs have suffered the damages and losses set forth herein including but not limited to substantial physical, psychological, economic, financial, reputational, and other injuries..

242.    Plaintiffs are entitled to all costs and attorneys' fees incurred as a result of the unlawful behavior complained of herein.

243.    No previous application has been made for the relief requested herein.

**WHEREFORE,** in consideration of the above claims, Plaintiffs request that a jury be selected to hear this case and render a verdict for the Plaintiffs, and against the Defendants, and

that the jury selected award damages to the Plaintiffs in an amount which will effectively prevent other similarly caused acts and adequately reflects the enormity of the Defendants' wrongs and injuries to the Plaintiffs due to the Defendants' faulty conduct, including but not limited to:

        a.      Declaring the acts and practices complained of herein to be a violation of Title VII;

        b.      Declaring the acts and practices complained of herein to be a violation of the PHRA;

        c.      Enjoining and restraining permanently the violations alleged herein;

        d.      All available compensatory damages for the described losses with respect to each cause of action;

        e.      Past and future medical expenses, as well as the costs associated with past and future life care;

        f.      Past and future lost wages and loss of earning capacity;

        g.      Past and future emotional distress;

        h.      Consequential and/or special damages;

        i.      Liquidated damages;

        j.      All available non-economic damages, including without limitation pain, suffering, and loss of enjoyment of life;

        k.      Punitive damages with respect to each cause of action;

        l.      Reasonable and recoverable attorney's fees;

        m.      Costs of this action;

        n.      All other damages available to Plaintiffs pursuant to any of the above claims; and

        o.      Pre-judgement and all other interest recoverable.

Further, Plaintiffs request that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

**LAFFEY, BUCCI, D'ANDREA,
REICH & RYAN, LLP**

By: */s/ M. Stewart Ryan, Esq.*
M. Stewart Ryan, Esq.
sryan@laffeybucci.com
Alexandria MacMaster, Esq.
amacmaster@laffeybucci.com
Brenda Harkavy, Esq.
bharkavy@laffeybucci.com
1100 Ludlow Street. Suite 300
Philadelphia, PA 19107
Telephone: 215-399-9255
Facsimile: 215-857-0075
*Attorneys for Plaintiff*

Dated: June 19, 2025

# Exhibit A

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Philadelphia District Office**
801 Market Street, Suite 1000
Philadelphia, PA  19107-3126
Email: PDOcontact@eeoc.gov
Website: eeoc.gov

# <u>DETERMINATION AND NOTICE OF RIGHTS</u>

(This Notice replaces EEOC FORMS 161 & 161-A)

To:   John Doe A.S.M.

Re:   John Doe A.S.M.    v. THE CHEESECAKE FACTORY INC.
       EEOC Charge Number: 530-2023-00588

EEOC Representative and phone:       Philadelphia Legal Unit, (267) 589-9707

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

Please retain this notice for your records.

On Behalf of the Commission:

Digitally Signed By: Karen McDonough
Mon Mar 24 00:00:00 EDT 2025

Karen McDonough
Deputy District Director

Cc:
Caitlin Barry                              Nestor Barrero
Administrator                              Partner
VLS Farmworker Legal Aid Clinic            Constangy Brooks
299 N. Spring Mill Road                    2029 CENTURY PARK E, STE1100
Villanova, PA 19085                        Los Angeles, California 90067

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### PRIVATE SUIT RIGHTS  --        Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred more than 2 years (3 years) before you file suit may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – not 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.  Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 530-2023-00588 to the District Director at Jamie Williamson, 801 Market St Suite 1000, Philadelphia, PA 19107. You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login or PHILFOIA@eeoc.gov.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue.  After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

# Exhibit B



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Philadelphia District Office**
801 Market Street, Suite 1000
Philadelphia, PA  19107-3126
Email: PDOcontact@eeoc.gov
Website: eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161 & 161-A)

To:  Jane Doe M.L.R.M.

Re:  Jane Doe M.L.R.M.  v. THE CHEESECAKE FACTORY INC.
EEOC Charge Number: 530-2023-00551

EEOC Representative and phone:          Philadelphia Legal Unit, (267) 589-9707

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

Please retain this notice for your records.

On Behalf of the Commission:

Digitally Signed By: Karen McDonough
Mon Mar 24 00:00:00 EDT 2025

Karen McDonough
Deputy District Director

Cc:
Caitlin Barry                                              Nestor Barrero
Administrator                                             Partner
VLS Farmworker Legal Aid Clinic                Constancy Brooks
299 N. Spring Mill Road                             2029 CENTURY PARK E, STE1100
Villanova, PA 19085                                   Los Angeles, California 90067

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### PRIVATE SUIT RIGHTS  --        Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred more than 2 years (3 years) before you file suit may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – not 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.  Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 530-2023-00551 to the District Director at Jamie Williamson, 801 Market St Suite 1000, Philadelphia, PA 19107. You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login or PHILFOIA@eeoc.gov.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue.  After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

# Exhibit C

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Philadelphia District Office**
801 Market Street, Suite 1000
Philadelphia, PA  19107-3126
Email: PDOcontact@eeoc.gov
Website: eeoc.gov

## <u>DETERMINATION AND NOTICE OF RIGHTS</u>

(This Notice replaces EEOC FORMS 161 & 161-A)

To: Jane Doe E.R.R.

Re: Jane Doe E.R.R. v. THE CHEESECAKE FACTORY INC.
 EEOC Charge Number: 530-2023-00534

EEOC Representative: Philadelphia Legal Unit, (267) 589-9707

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

Please retain this notice for your records.

On Behalf of the Commission:

Digitally Signed By: Karen McDonough
Tue Mar 25 00:00:00 EDT 2025

Karen McDonough
Deputy District Director

Cc:

Caitlin Barry
Director of Farmworker Legal Aid Clinic
VLS Farmworker Legal Aid Clinic
299 N. Spring Mill Road
Villanova  Pennsylvania 19085

Nestor Barrero, ESQ
Constangy, Brooks, Smith & Prophete, LLP
2029 Century Park
Suite1100
Los Angeles  California 90067

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## PRIVATE SUIT RIGHTS  --        Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred more than 2 years (3 years) before you file suit may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – not 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3- year EPA back pay recovery period.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.  Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 530-2023-00534 to the District Director at Jamie Williamson, 801 Market St Suite 1000, Philadelphia, PA 19107. You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login or PHILFOIA@eeoc.gov.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue.  After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

# Exhibit D



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Philadelphia District Office**
801 Market St, Suite 1000
Philadelphia, PA 19107
(267) 589-9700
Website:  www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 03/21/2025

**To:** ▆ Jane Doe E.G.P. ▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆

Charge No: 530-2023-00529

EEOC Representative:
Legal Unit (267) 589-9707

---

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:  Karen McDonough
03/21/2025

Karen McDonough
Deputy District Director

**Cc:**

Jineene Adler
The Cheesecake Factory
26901 Malibu Hills Rd
Calabasas, CA 91301

Nestor Barrero, Esq.
Constangy, Brooks, Smith and Prophete, LLP
2029 Century Park East, Suite 1100
Los Angeles, CA 90067


Please retain this notice for your records.

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 530-2023-00529 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Jamie Williamson, 801 Market St Suite 1000, Philadelphia, PA 19107.

**<u>To make a Section 83 request for your charge file</u>**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 530-2023-00529 to the District Director at Jamie Williamson, 801 Market St Suite 1000, Philadelphia, PA 19107.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to
https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

# Exhibit

# E

**REMINDER: Important Document Available for EEOC Charge 530-2023-01766 / RECORDATORIO: Documento Importante Está Disponible para la Queja/Querella Número 530-2023-01766**

**EEOC** <no-reply@service.eeoc.gov>                                    29 de marzo de 2025, 21:04
Para: John Doe A.A.C.



**U.S. Equal Employment Opportunity Commission**

EEOC has made a decision regarding charge number 530-2023-01766. It is very important that you download and retain a copy of this document. You may review this decision by logging into the EEOC Public Portal.

This email is an official notification from the Equal Employment Opportunity Commission (EEOC) regarding charge 530-2023-01766. Please do not reply to this email.

*Notice of Confidentiality: This email may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact info@eeoc.gov and destroy all copies of the original message and attachments.*

La EEOC ha tomado una decisión con respecto a la queja/querella número 530-2023-01766. Es muy importante que descargue y retenga una copia de este documento. Puede revisar esta decisión iniciando sesión en el Portal Público de la EEOC .

Este correo electrónico es una notificación oficial de la Comisión para la Igualdad de Oportunidades en el Empleo (EEOC, por sus siglas en inglés) con respecto a la queja/querella 530-2023-01766. Por favor, no responda a este correo electrónico.

*Aviso de confidencialidad: La información contenida en este correo electrónico puede contener información privilegiada y confidencial, incluida información protegida por las leyes de privacidad federales y estatales. Está destinada únicamente al uso de la(s) persona(s) nombrada(s) anteriormente. Si usted no es el(la) destinatario(a) previsto(a), se le notifica que cualquier revisión, difusión, distribución o duplicación de esta comunicación está estrictamente prohibida y puede ser ilegal. Si usted no es el(la) destinatario(a) previsto(a), póngase en contacto con nosotros en info@eeoc.gov y destruya todas las copias del mensaje original y los archivos adjuntos.*