**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOHN DOE A.S.M., et al.** | : |
| | : **CIVIL ACTION NO. 2:25-cv-3144** |
| **Plaintiffs,** | : |
| | : **HON. JUAN R. SANCHEZ** |
| **v.** | : |
| | : |
| **THE CHEESECAKE FACTORY, INC.,** | : |
| **et al.** | : |
| **Defendants.** | : |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO STAY AND COMPEL ARBITRATION**

Plaintiffs, by and through their counsel, hereby respond in opposition to Defendants Motion to Stay and Compel Arbitration, and state:

**I.     Introduction**

This case arises from the discrimination, harassment, abuse, and trafficking of Plaintiffs by Defendants (herein collectively "TCF") at the Cheesecake Factory in Willow Grove, PA. Plaintiffs allege that they were subjected to years of mistreatment, discrimination, and trafficking. Plaintiffs allege that Defendants facilitated the procurement of false and fraudulent identification and immigration documents by Plaintiffs for the purpose of exploiting Plaintiffs on the basis of their national origin and their fear of deportation from the United States.

On or about June 19, 2025, Plaintiffs filed their Complaint in the United States District Court of the Eastern District of Pennsylvania. On August 19, 2025, Defendants filed their Motion to Stay and Compel Arbitration, wherein Defendants allege that each Plaintiff entered into a binding arbitration agreement at the time of their hire. For the following reasons, this Court should either deny the motion or direct the parties to engage in a period of discovery to resolve factual disputes before entering an Order on the instant motion.

## II.    __Factual Background__

### *The Alleged Arbitration Agreements*

TCF rests its argument not on an arbitration policy or procedure or even a stand-alone arbitration agreement, but on a single provision, comprising of three sentences, that TCF alleges Plaintiffs signed as part of an acknowledgment form appended to TCF's handbook. *See* Defendants' Exhibits F.1 – F.5. This alleged arbitration "agreement" is three sentences in total. *See* Declaration of Barbara Lewis. ("Lewis Dec.") at ¶ 21. The "agreement's" three sentences comprise of a statement that "differences may arise" between an employee and TCF; that the employee agrees to participate in an "impartial dispute resolution" process; and that if either employee or company determine that TCF's "internal procedures" do not result in a "mutually acceptable" resolution that the employee will participate in "arbitration proceedings." *Id.* This alleged agreement *does not* identify any process of procedure related to the "arbitration proceedings," including the forum for such proceedings, the selection process for an arbitrator or arbitrators, a definition for what constitutes a "difference" that may be subject to either the "impartial dispute resolution" process or "arbitration proceedings," what difference, if any, there is between the "impartial dispute resolution" process or "arbitration proceedings," and who bears the costs of such an "arbitration proceeding" among many other things. *Id.* The handbook itself does not contain a single reference to arbitration.

Interestingly, TCF makes reference to a "long form version" of TCF's "ADR Policy and Arbitration Agreement" which it began using in 2013. TCF refers to this long form version as an "important document" on par with the handbook itself. Despite having been rolled out in 2013, the year Plaintiff A.S.M. was hired, TCF failed to produce this long form version of its ADR Policy or Arbitration Agreement or produce any evidence that any Plaintiff received it or was given notice of it. While Plaintiffs cannot be sure what precisely TCF is referring to as its "long form version" of an arbitration agreement, Plaintiffs believe it is the same document that was at the center of a prior case involving TCF and counsel for Plaintiffs. *See* TCF Arbitration

Agreement, a true and correct copy of which is attached hereto as Exhibit 1.[1] To be clear, while TCF claims that it updated its Handbook, and provided notice of same to all employees, including Plaintiffs, TCF does not claim that it ever provided notice of or access to the "long form version" of the arbitration agreement to Plaintiffs. *See* Lewis Dec. at ¶ 15 – 19. TCF claims that these "re-issued" handbooks included a revised Arbitration Acknowledgment but have not produced these revised Arbitration Acknowledgments at all, let alone copies signed by Plaintiffs. *Id.* And, setting that aside, TCF has not produced any evidence that Plaintiffs clicked on the notifications or accessed or were provided these "re-issued" handbooks. *Id.*

While failing to produce any evidence that this "important document," the "long form" agreement, was provided to any of the Plaintiffs, TCF nonetheless seems to rely on its provisions when arguing its motion, including the claims that if a dispute arose "the parties would agree on arbitration through either AAA or JAMS" and that TCF would be solely responsible to pay the costs of arbitration, neither of which is contained anywhere in the arbitration agreements that Plaintiffs purportedly signed. *Comp.* Lewis Dec. at ¶ 13 *with* Defendants' Exhibits F.1 – F.5 at ¶ 8 *with* Exhibit 1 at p. 4 and p. 5.

Furthermore, the handbook receipt, in the paragraphs preceding the alleged arbitration agreement, grants TCF the exclusive right to "change, rescind, or add" any policy, benefit, or practice contained in the handbook. *See, e.g.,* Defendants' Exhibit F.5, ¶ 1. TCF's unilateral right to "change, rescind, or add" any policy, benefit, or practice is unfettered; TCF does not require that such changes be announced, reduced to writing, acknowledged by employees, or accepted by employees. *Id.* The same handbook receipt goes on to state explicitly that no TCF handbook or training materials can be considered to be "an agreement or contract of employment" or otherwise alter the at will employment status established by TCF. *Id.* at ¶ 3.

---

[1] Exhibit 1 has been redacted to protect the identity of the employee-plaintiff in that matter as she proceeded anonymously in that litigation. While the trial initially compelled the matter to arbitration, the arbitrator selected by the parties returned the matter to the state trial court after determining the claims advanced in that matter, arising from an employee-on-employee sexual assault, were outside the scope of the arbitration agreement. *See Doe v. Cheesecake Factory*, 300 A.3d 1070 (Pa. Super. 2023).

Defendants do not produce any evidence that Plaintiffs were actually provided with copies of the handbook, instead arguing that it is simply TCF policy to provide a new employee copies of the handbook. *See* Lewis Dec. at ¶ 9 – 12. Similarly, while TCF alleges that "new hires," like Plaintiffs, are notified that the eighth paragraph of the handbook receipt contains an arbitration provision, what TCF is really saying is that it is their policy to do this; TCF has not presented any competent evidence to suggest all new hires, including Plaintiffs, were actually informed of the alleged arbitration provision in the handbook receipt. *See* Lewis Dec. at ¶ 13. For their part, each of the Plaintiffs deny that they were ever informed of any arbitration agreement, procedure, policy, or provision at any time they were employed by TCF. *See* Declaration of Plaintiff A.S.M. at ¶ 10 – 11, a true and correct copy of which is attached hereto as Exhibit 2-A; *See* Declaration of Plaintiff M.L.R.M. at ¶ 10 – 11, a true and correct copy of which is attached hereto as Exhibit 2-B; *See* Declaration of Plaintiff E.R.R. at ¶ 10 – 11, a true and correct copy of which is attached hereto as Exhibit 2-C; *See* Declaration of Plaintiff E.G.P. at ¶ 10 – 11, a true and correct copy of which is attached hereto as Exhibit 2-D; *See* Declaration of Plaintiff A.A.C. at ¶ 10 – 11, a true and correct copy of which is attached hereto as Exhibit 2-E.[2]

TCF also claims that it produces its handbook and the handbook receipt in both English and Spanish. In support of its translation of the handbook receipt at issue for three of the five plaintiffs, TCF relies on an unsworn certification from a person named Walter L. Krochmal. Krochmal claims, and TCF corroborates, that this translation was made in connection with a different case involving different parties. Neither TCF nor Krochmal produce the Spanish-language version of the document that Krochmal translated nor does either identify or claim that the translated document is the same one or version that Plaintiffs were purportedly presented with. Simply put, the evidence put forward by TCF in this regard is not competent.

---

[2] Each Plaintiff speaks Spanish. Plaintiffs have also attached a declaration explaining the process by which the English-language declarations were drafted. *See* Declaration of Diana Nolte, a true and correct copy of which is attached hereto as Exhibit 2-F.

### *Facts Common to All Plaintiffs*

In support of Plaintiffs' Opposition, each Plaintiff submitted a declaration. Each has certain facts in common. Each Plaintiff affirmed when he or she was hired to work at the Cheesecake Factory in Willow Grove, ranging from 2008 – 2013. *See* Exhibits 2-A – 2-E at ¶ 2. Each affirmed that they, at the direction of TCF, procured fraudulent work documents. *See id.* at ¶ 2 – 5. Each affirmed that after they were hired they were provided a series of documents, none of which they could say were the handbook receipt produced by TCF, that they felt pressure to sign the documents, that they felt they had no choice but to sign the documents, and that they signed the documents as quickly as they could. *See id.* at ¶ 2 – 5. Each affirmed that at no time was it ever explained to them, during their entire time at the Cheesecake Factory, that TCF had an arbitration process, what arbitration was, or that part of the handbook receipt was an arbitration agreement. *See id.* at ¶ 6, 10 – 11. Finally, each affirmed that they never intended to, nor would they, surrender their rights to access the courts. *See id.* at ¶ 11.

### *Plaintiff John Doe A.S.M.*

As it relates to the alleged arbitration agreement produced by TCF for Plaintiff A.S.M., he denies that the initials appearing on the second page of the document are actually his; indeed even a casual observation of the document shows a marked difference between the initials provided on the first page compared with the second. *See* Exhibit 2-A at ¶ 8; *see also* Defendants' Exhibit F.1.

### *Plaintiff Jane Doe M.L.R.M.*

As it relates to the alleged arbitration agreement produced by TCF for Plaintiff M.L.R.M., she denies any memory of seeing it, reviewing it, or writing on it. *See* Exhibit 2-B at ¶ 8.

### *Plaintiff Jane Doe E.R.R.*

As it relates to the alleged arbitration agreement produced by TCF for Plaintiff E.R.R., she denies that the initials appearing throughout the document are actually hers. *See* Exhibit 2-A at ¶ 8; *see also* Defendants' Exhibit F.1. Perhaps of equal importance, the document produced by TCF is in English, *see* Defendants'

Exhibit F.3, yet Plaintiff E.R.R. affirms that at the time she signed any documents for TCF, she could barely understand spoken English and could not read English at all. *See* Exhibit 2-C at ¶ 3.

### Plaintiff Jane Doe E.G.P.

As it relates to the alleged arbitration agreement produced by TCF for Plaintiff E.G.P., she denies that the signature or initials appearing throughout the document are actually hers. *See* Exhibit 2-D at ¶ 8.

### Plaintiff John Doe A.A.C.

As it relates to the alleged arbitration agreement produced by TCF for Plaintiff A.A.C., while he acknowledges that the signature and initials appear to be his, s*ee* Exhibit 2-E at ¶ 8, the document produced by TCF is in English, *see* Defendants' Exhibit F.5, but Plaintiff A.A.C. could not read, speak, or understand the English language at all at the time the document was signed. *See* Exhibit 2-E at ¶ 3.

## III.  Legal Argument

### A.  Legal Standard

#### i.  *Motion Standard*

When it is apparent, based on the face of a Complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without any need for discovery. However, if an agreement to arbitrate is not incorporated in the Complaint or clear from the face of a Complaint, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on [the] question. After limited discovery, the court may entertain a renewed motion to compel arbitration, this time judging the motion under a summary judgment standard. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.,* 716 F.3d 764, 776 (3d Cir. 2013).

ii.   *Standard for Evaluating Contracts in Pennsylvania*

A federal court must look to the relevant state law on the formation of contracts to determine whether there is a valid arbitration agreement under the FAA. *See, e.g., First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995); *Blair v. Scott Specialty Gases,* 283 F.3d 595, 603 (3d Cir. 2002). Before concluding that there is a valid contract under Pennsylvania law, the court must "look to: (1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration." *ATACS Corp. v. Trans World Communications, Inc.,* 155 F.3d 659, 666 (3d Cir. 1998). "Consideration 'confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance or return promise bargained for and given in exchange for the original promise.'" *Channel Home Ctrs. v. Grossman,* 795 F.2d 291, 299 (3d Cir. 1986). Without consideration, a contract is unenforceable. *Id.* at 298–99.

Pennsylvania law requires that any agreement to arbitrate be "clear and unmistakable," and holds that "such agreements should not be extended by implication." *Emmaus Mun. Auth. v. Eltz,* 204 A.2d 926, 927 (Pa. 1964); *see also Quiles v. Fin. Exch. Co.*, 879 A.2d 281, 287 (Pa. Super. Ct. 2005) ("[S]uch agreements are upheld only where it is clear that the parties have agreed to arbitrate in clear and unmistakable manner."). "Under Pennsylvania law, explicit agreement is essential to the formation of an enforceable arbitration contract," so any argument that an employee has "impliedly agreed to arbitrate [their] claims must fail under Pennsylvania law." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 163 (3d Cir. 2009).

## B.  If This Court Does Not Outright Deny TCF's Motion Discovery Should be Ordered

Here, Plaintiffs' Complaint made no reference to any alleged arbitration agreement. Further, Plaintiffs have each submitted declarations testifying to factual disputes. Based on this alone, Plaintiffs are entitled to conduct discovery to resolve these factual disputes and to challenge "the validity of the ADR Agreement and 'whether there was a meeting of the minds on the agreement to arbitrate.'" *Guidotti,* 716 F.3d at 774. As will be outlined further below, Plaintiffs also challenge the alleged arbitration agreement as unconscionable and

"[p]re-arbitration discovery has also been allowed to determine whether an arbitration clause is unconscionable." *Id.* at 774 n .5. To the extent that this Court does not outright deny TCF's motion, discovery should be ordered.

**C. The Alleged Arbitration Agreement Is Illusory**

As noted above, TCF's handbook receipt form, in the paragraphs preceding the alleged arbitration agreement, leads with granting TCF the exclusive authority to "change, rescind, or add" any policy, benefit, or practice contained in the handbook. *See, e.g.,* Defendants' Exhibit F.5, ¶ 1. The terms of the handbook receipt do not require TCF to announce changes, reduce changes to writing, that employees acknowledge such changes, or that employees actually accept such changes. *Id.* The form also explicitly states that no TCF handbook or training materials can be considered to be "an agreement or contract of employment" or otherwise alter the at will employment status established by TCF. *Id.* at ¶ 3.

Federal courts examining similar forms or receipts have determined that clauses like the one described here operate to apply and modify the form "as a whole." *Coady v. Nationwide Motor Sales Corp.*, 32 F.4th 288, 292–93 (4th Cir. 2022). When such a form or receipt allows for unilateral changes to be made, especially when such changes need not be communicated to or acknowledged by employees, the form or receipt, and by extension any alleged agreement to arbitrate, is rendered illusory and unenforceable. *Id.; see also Crump v. MetaSource Acquisitions, LLC,* 373 F. Supp. 3d 540, 545–47 (E.D. Pa. 2019).

Courts in this District have found similar forms and receipts to be illusory even when they provide greater protection to employees. For example, in *Crump v. MetaSource Acquisitions, LLC*, a defendant business attempted to compel an employee to arbitrate their claims based on a single statement in a handbook acknowledgment form. 373 F. Supp. 3d 540, 545. All the parties agreed that the only place any arbitration language appeared was in the handbook receipt, and not the handbook itself. *Id.* The same receipt provided that the defendant business could make changes to the handbook and other policies at any time. *Id.* Unlike here, the defendant business at least required of itself that such changes be made in writing. *Id.* at 546. The receipt,

however, did not require the defendant business to give notice to employees, did not require employees to accept changes, and did not limit changes only to future incidents. *Id.* The provision gave the defendant business "unfettered discretion" to change or modify its obligations, including its obligation to arbitrate claims. *Id.* As such, the "obligation to arbitrate 'is entirely optional,' its promise to arbitrate is 'illusory and, therefore, lacking consideration and unenforceable.'" *Id.*, *citing*, *SCF Consulting, LLC v. Barrack, Rodos & Bacine*, 175 A.3d 273, 278 (Pa. 2017) (quoting *Geisinger Clinic v. Di Cuccio*, 606 A.2d 509, 512 (Pa. Super. 1992).

That the agreement was illusory and lacking in consideration was true even given the fact that the employee plaintiff continued working for the defendant business. 373 F. Supp. 3d at 549. In particular, the employee plaintiff in *Crump* had been working for approximately one week before he was presented with the handbook receipt form. *Id.* Because he had already begun to work there was no "new" consideration offered for the promise to arbitrate. *Id.* The same is true here, as each Plaintiff has testified that they had already been hired or begun work by the time they were allegedly presented with the agreement to arbitrate contained in the handbook acknowledgment form. *See* Exhibits 2-A – 2-E at ¶ 5.

TCF cites to a number of unpublished cases in support of its claim that arbitration agreements contained in employee handbooks are routinely enforced. *See* Defendant's Motion at 8 – 9, *citing Alexander v. Raymours Furniture Co.*, 2014 WL 3952944, at *5 (E.D. Pa. Aug. 13, 2014); *Grant v. Phila. Eagles, LLC,* 2009 WL 1845231, at * 4 (E.D. Pa. June 24, 2009); *Gutman v. Baldwin Corp.,* 2002 WL 32107938, at *4 (E.D. Pa. Nov.22, 2002); *Hamilton v. Travelers Prop. & Cas. Corp.,* 2001 WL 503387, at * 2 (E.D. Pa. May 11, 2001); *Wilson v. Darden Rests., Inc.,* 2000 WL 150872, at *3–4 (E.D. Pa. Feb. 11, 2000); *Venuto v. Ins. Co. of N. Am.,* 1998 WL 414723, at *5–6 (E.D. Pa. July 22, 1998); *cf. Brennan v. CIGNA Corp.,* 282 F. App'x 132, 135–36 (3d Cir. 2008). Each of these cases are distinguishable. In *Alexander*, the defendant business updated its employee handbook in 2012 to include, *inter alia*, an arbitration policy. The policy was detailed and included definitions of critical terms and a defined scope of what was covered by the policy. 2014 WL 3952944, at *1 – 2. When the program was rolled out, the defendant business notified all employees in writing

and called special attention to the revised sections, including the arbitration provision. *Id.* at *2. The defendant

business also required employees to sign a new acknowledgment form which was tracked and documented

electronically by the defendant business. *Id.* This Court determined the agreement was enforceable after the

plaintiff challenged only the consideration element. *Id.* at *6. Here, not only does the Plaintiffs' challenge

extend far beyond consideration, but the distinctions between the defendant employer's arbitration program in

*Alexander* and TCF's here is stark when considering the detail contained in the separate arbitration policy found

in *Alexander*. And the same is true of each of the cases cited by TCF in support of this argument: the defendant

businesses in those cases had either stand-alone arbitration policies or policies contained within an employee

handbook that were sufficiently detailed and not vague so as to put the plaintiff employees on notice of the

policy and to guide the parties as to the scope and appropriate forum for claims subject to arbitration.

### D. TCF Cannot Demonstrate that Plaintiffs Assented to the Alleged Arbitration Agreement

TCF has also failed to demonstrate that there was assent on behalf of each Plaintiff. As an initial matter,

a plaintiff's conduct does not constitute a manifestation of assent where he has no "meaningful opportunity" to

learn the terms of the contract. *Solis v. ZEP LLC*, No. 19-4230, 2020 WL 1439744, at *5 (S.D.N.Y. Mar. 24,

2020); *Quiles v. Fin. Exch. Co.,* 879 A.2d 281, 286 (Pa. Super. 2005) (no contract where plaintiff was "not

even given the opportunity to read the terms of the arbitration agreement"); *Walker v. Ryan's Family Steak

Houses*, 400 F.3d 370, 384 (6th Cir. 2005) (no contract where plaintiffs had to sign "on the spot," had "no

opportunity" to consult an attorney, and defendants "did not tell [them] they were waiving their right to a jury

trial"); *Am. Heritage Life Ins. v. Lang*, 321 F.3d 533, 538 (5th Cir. 2003) (no contract where "ignorance by one

party as to the terms of the agreement ... was induced by acts of the other party"); Restatement (Second) of

Contracts §§ 161, 163 (1981) (no contract where a party "neither knows nor has reasonable opportunity to

know" the essential terms of the contract).

As Plaintiffs have testified, each was under pressure to sign the forms presented to them and none of

the Plaintiffs had any meaningful opportunity to read, review, or understand the documents (to the extent they

were even presented with the handbook receipt in the first place). *See* Exhibits 2-A – 2-E at ¶ 5 – 6. No one explained anything about arbitration to the Plaintiffs. *See* Exhibits 2-A – 2-E at ¶ 5 – 6, 10 – 11. TCF cannot produce any competent evidence to the contrary, instead relying on claims that each Plaintiff had the forms presented and explained to them because that is what TCF policy calls for. *See* Lewis Dec. at ¶ 9 – 12. Further, each Plaintiff has testified that, throughout their time working for TCF and since, they are not familiar with the terms arbitration or what the process of arbitration entails. *See* Exhibits 2-A – 2-E at ¶ 11.

Beyond these generally applicable facts, Plaintiffs E.R.R. and A.A.C. were presented forms written entirely in English, a language which neither could read at the time they were hired at TCF. Additionally, Plaintiffs A.S.M., E.R.R., and E.G.P. affirmatively deny signing and/or initialing the form in the space where arbitration is identified and beyond. *See* Exhibits 2-A – 2-E at ¶ 8. Indeed, the form TCF claims was initialed by ASM reflects undeniable differences in handwriting from one page to the next, a point TCF ignores. Plaintiff M.L.R.M presently has no memory of being presented with or initialing/signing the form. *See* Exhibit 2-B at ¶ 8.

These are facts upon which other reviewing courts have found that arbitration agreements lacked assent and were therefore unenforceable. In *Quiles*, the Pennsylvania Superior Court rejected an arbitration agreement that was signed "under pressure" from the employees manager, without the opportunity to consult with counsel, and when the employee "lack[ed a] command of the English language and [was] unfamiliar[] with the term arbitration [or] the process generally." *Quiles*, 879 A.2d at 287; *see also Mikeladze v. Raymours Furniture Co., Inc.*, 2020 WL 7240379, at *4 (E.D. Pa. Dec. 8, 2020); *Min Fu v. Hunan of Morris Food Inc.*, 2013 WL 5970167, at *6 (D.N.J. Nov. 6, 2013); *Plebani v. Bucks Cnty. Rescue Emergency Med. Servs.*, 2007 WL 4224365, at *9 (E.D. Pa. Nov. 27, 2007).

### E. The Alleged Arbitration Agreement is Unconscionable

Under Pennsylvania law, a party may void an unconscionable contract. *Jean v. Bucknell Univ.*, 2021 WL 1521724, at *8 (M.D. Pa. Apr. 16, 2021). To do so, the party challenging an arbitration agreement bears

the burden of demonstrating "that the agreement is *both* procedurally and substantively unconscionable." *Id.* A contract is substantively unconscionable when it unreasonably favors "the party with the greater bargaining power. *Id.* In contrast, " '[p]rocedural unconscionability' describes the process by which the parties entered into the contract," and it exists where one party lacks a meaningful choice in bargaining for or accepting a particular provision. *Id.* In Pennsylvania, unconscionability is judged on a "sliding scale" where if procedural unconscionability is high, less substantive unconscionability will be required to invalidate and contract and vice versa. *Id.*

Here, while TCF seemingly attempts to inappropriately borrow from its "long form" arbitration agreement to claim Plaintiffs' purported agreement was valid (and thus not unconscionable), it is undisputed that Plaintiffs were neither presented with nor signed any "long form" arbitration agreement. *See* Lewis Dec. at ¶ 15 – 19. That TCF would attempt to rely on the "long form" agreement knowing that it was never presented to Plaintiffs speaks to the inadequacies of the alleged arbitration agreement contained in the handbook receipt. While, even if Plaintiffs had been presented with the "long form" arbitration agreement it would still be unconscionable, the only thing this Court has to analyze is the vague three sentence portion of the handbook receipt produced by TCF. *See, e.g.*, Defendant's Exhibit F.1 at ¶ 8. The alleged arbitration agreement provides as follows:

> I recognize that differences may arise between me and the Company during, or following, my employment with the Company. I agree to participate in impartial dispute-resolution proceedings as a condition of and as consideration for the offer of employment by the Company. If I, or the Company, determine that the Company's internal procedures for handling claims (including but not limited to, reporting claims to my manager, the Area Director of Operations, the CARELINE, and/or the Staff Relations Department), have not resulted in a mutually acceptable resolution of disputes between me and the Company, **I** agree to participate in arbitration proceedings.

*See, e.g.,* Defendant's Exhibit F.1 at ¶ 8.

The "agreement's" three sentences comprise of a statement that "differences may arise" between an employee and TCF; that the employee agrees to participate in an "impartial dispute resolution" process; and

that if either employee or company determine that TCF's "internal procedures" do not result in a "mutually acceptable" resolution that the employee will participate in "arbitration proceedings." *Id.*

In *Jean v. Bucknell Univ.* the court found an alleged arbitration agreement both substantively and procedurally unconscionable. 2021 WL 1521724. First, the court noted that the defendant's ability to unilaterally amend or terminate the agreement was substantively unconscionable. *Id.* at *11 – 13. The same is true here. The court next noted a provision of the arbitration agreement that arguably provided that the defendant could unilaterally select two of the three panel members for the arbitration. *Id.* 14 – 15. The "ambiguity" in the agreement led the court to conclude this provision was unconscionable. *Id.* Here, the TCF arbitration provision is entirely silent as to how an arbitrator may be selected and should, for the same reasons identified in *Jean*, be held substantively unconscionable. The court similarly noted that the defendant in *Jean* was unilaterally responsible for selecting the arbitral forum. *Id.* at *16 – 17. Importantly, while there was some reference to the process for selecting an "Arbitration Association" to hear a matter, the court found this provision was so vague as to render it meaningless. *Id.* TCF claims, without any actual evidentiary support, that the parties would be left to choose between AAA or JAMS for the arbitration forum. It is not clear from where this claim emanates as even the "long form" arbitration agreement TCF employs requires only that the arbitral forum be one in which certain AAA rules apply. *Comp.* Lewis Dec. at ¶ 13 *with* Defendants' Exhibits F.1 – F.5 at ¶ 8 *with* Exhibit 1 at p. 4. Here, the complete lack of any written procedure or process for selecting an arbitral forum or an arbitrator, especially in light of TCF's baseless claim that such a process does exist, weighs in favor of this Court finding the alleged arbitration agreement to be substantively unconscionable.

Turning to procedural unconscionability, the *Jean* court noted that there exist two types. First, is procedural unconscionability arising from "unfair surprise" which "involves contractual terms which are not typically expected by the party who is being asked to 'assent' to them." 2021 WL 1521724 at *18. "An unexpected clause often appears in the boilerplate of a printed form and, if read at all, is often not understood." *Id.* Accordingly, this type of procedural unconscionability may be established by pointing to a party's capacity

for understanding the contract, or the circumstances surrounding the contract's formation. *Id.* Other relevant factors may include whether the party received guidance regarding the contract, or whether the agreement contains "fine print and convoluted or unclear language." *Id.* The second form of procedural unconscionability described by the court involves cases where there may be "apparent but not genuine assent." *Id.* These are most often found in cases involving adhesion contracts, where one party's bargaining power far exceeds the other such that it creates a "take it or leave it" scenario where the disadvantaged party has no choice but to sign. *Id.* at 18 – 19.

Starting with the latter, the facts here make it clear that Plaintiffs were in a disadvantaged position compared to TCF. Each was an undocumented worker, who had just obtained or procured illegal working papers at the direction of TCF, and who risked not only their economic livelihood but their liberty should they have refused to sign whatever was presented to them. To do otherwise and defy TCF would have resulted at least in termination and potentially confinement until deportation. This was also a form document created exclusively by TCF that could not be meaningfully negotiated in any way. The bargaining power of TCF compared to Plaintiffs cannot be understated. The alleged arbitration agreement is therefore a contract of adhesion and procedurally unconscionable.

Beyond being procedurally unconscionable based on its status as an adhesion contract, it is procedurally unconscionable due to "unfair surprise." In making this determination in the *Jean* case, the court noted that the plaintiff was a twenty-year-old college student at the time he signed the agreement and lacked any sort of legal background or training. *Id.* at *20 – 21. Further, the court noted that the agreement was vague and ambiguous on numerous material terms which aided in rendering it procedurally unconscionable. *Id.* Plaintiffs respective life circumstances have already been addressed above. But beyond that, this alleged arbitration agreement is procedurally unconscionable not just because it is vague (identifying that "differences" will be subject to arbitration without defining what "differences" are while, seemingly interchangeably, referring to "disputes" being subject to arbitration) but the alleged agreement fails to outline a number of critical

procedures including how the arbitrator or forum is selected, which party bears the costs of the arbitration, limitations, if any, on discovery, and what, if any, powers are delegated to the arbitrator, just to name a few.

**F. The Claims Advanced by Plaintiffs Fall Outside the Scope of the Alleged Arbitration Agreement**

As noted, among the other fatal omissions in the handbook receipt when addressing arbitration, there is no provision related to delegation of powers. Which is to say, while some arbitration agreements defer to the arbitrator to define whether claims fall within the scope of the agreement, this alleged agreement is silent and so that determination falls to this Court. Here, it cannot be said each and every claim advanced by Plaintiffs can be considered a "difference" subject to arbitration. Most notably, Plaintiffs here bring claims related to allegations of labor trafficking: that they were enticed to work at the Cheesecake Factory in Willow Grove because they learned through recruitment or were told undocumented people could be hired there only to have TCF direct them to illegally obtain fraudulent working papers so that TCF could further abuse them by subjecting them to harassment and deplorable working conditions and working hours for which they were never paid. *See generally* Plaintiffs' Complaint, Doc. 1. Just as in *Doe v. Cheesecake Factory*, where the arbitrator determined, pursuant to a delegation clause, that it was not foreseeable to an employee that they could be sexually assaulted while working in a restaurant (and therefore such claims out be outside the scope of the arbitration agreement), in this matter it was simply not foreseeable to Plaintiffs that TCF would commit egregious acts of harassment and labor trafficking against them and that they would contract away their rights to seek redress. *See Doe*, 300 A.3d 1070, 1076 – 78.

**IV.    Conclusion**

WHEREFORE, for the reasons articulated herein, Plaintiffs respectfully request that this Honorable Court DENY the Motion to Stay and Compel Arbitration of Defendants or, in the alternative, Order that discovery been taken to address the validity and enforceability of the alleged arbitration agreement.

**LAFFEY, BUCCI, D'ANDREA,
REICH & RYAN, LLP**

By: /s/ M. Stewart Ryan, Esq.
M. Stewart Ryan, Esq.
sryan@laffeybucci.com
Alexandria MacMaster, Esq.
amacmaster@laffeybucci.com
Brenda Harkavy, Esq.
bharkavy@laffeybucci.com
1100 Ludlow Street. Suite 300
Philadelphia, PA 19107
Telephone: 215-399-9255
Facsimile: 215-857-0075
*Attorneys for Plaintiff*

Dated: September 2, 2025

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOHN DOE A.S.M., and** | : |
| **JANE DOE M.L.R.M., and** | : **CIVIL ACTION NO.** |
| **JANE DOE E.R.R., and** | : |
| **JANE DOE E.G.P., and** | : **JURY TRIAL DEMANDED** |
| **JOHN DOE A.A.C.,** | : |
| | : |
| **Plaintiffs,** | : |
| | : |
| | : |
| **v.** | : |
| | : |
| **THE CHEESECAKE FACTORY, INC.** | : |
| **and THE CHEESECAKE FACTORY** | : |
| **BAKERY, INC., and THE** | : |
| **CHEESECAKE FACTORY** | : |
| **RESTAURANTS, INC., JOHN DOES** | : |
| **1-100, and ABC ENTITIES 1-10,** | : |
| | : |
| **Defendants.** | : |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served on all counsel of record in this matter via the Court's CM/ECF system on this the 2nd day of September, 2025.

**LAFFEY, BUCCI, D'ANDREA,
REICH & RYAN, LLP**

By: <u>/s/ M. Stewart Ryan, Esq.</u>
*Attorney for Plaintiff*